UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VALENTINA WASHINGTON,<br><br>       Plaintiff,<br><br>   v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security<br>Administration,<br><br>       Defendant. | Case No. 3:15-cv-01261-LB<br><br>**ORDER GRANTING IN PART<br>PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT AND<br>DENYING DEFENDANT'S CROSS-<br>MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF Nos. 16, 17] |

## INTRODUCTION

The plaintiff Valentina Washington moves for summary judgment, seeking judicial review of a final decision by the Social Security Administration denying her disability benefits for her claimed disabilities of asthma, bronchitis, Hepatitis C, left arm pain, depression, anxiety, paranoia, HIV, and seizures. (Motion for Summary Judgment, ECF No. 16.[1]) The Administrative Law Judge ("ALJ") found that Ms. Washington had severe impairments of hypertension, polysubstance abuse, anxiety disorder and mood disorder but declared her not disabled and denied Social Security Income ("SSI") benefits. (Administrative Record ("AR") at 39.) The Commissioner

---

[1] Citations are to the Electronic Case File ("ECF"); pin cites are to the ECF-generated page numbers at the tops of the documents.

United States District Court<br>Northern District of California

1    opposes Ms. Washington's motion for summary judgment and cross-moves for summary

2    judgment. (Cross-Motion for Summary Judgment, ECF No. 17.)

3        Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision without oral

4    argument. All parties have consented to this court's jurisdiction. (Consent Forms, ECF Nos. 6,

5    10.) Upon consideration of the administrative record, the parties' briefs, and the applicable legal

6    authority, the court grants in part Ms. Washington's motion for summary judgment, denies the

7    Commissioner's cross-motion for summary judgment, and remands the case for further

8    proceedings consistent with this order.

9                                **STATEMENT**

10   **1. Procedural History**

11       On January 27, 2012, Ms. Washington filed a Title II application for Social Security Disability

12   Insurance benefits ("SSDI"), and on February 11, 2012, she filed a Title XVI application for

13   Supplemental Security Income ("SSI"). (AR 244-47, 250-58.) Ms. Washington claimed

14   disabilities of Hepatitis C, asthma, left hand paralysis, and seizures. (AR 79-80.) Both claims were

15   initially denied on August 1, 2012 (AR 145-48, 149-52), and upon reconsideration (AR 53-54,

16   156-62.) Ms. Kennedy timely filed a request for a hearing before an ALJ. (AR 163-64.) The ALJ

17   held a hearing on February 2, 2014. Ms. Washington was not able to attend in person at that

18   hearing. The ALJ continued the hearing until February 27, 2014 so that Ms. Washington could

19   attend and give testimony in person. (AR 14.)

20       Ms. Washington was represented at the hearing by her counsel, Nancy McGee. Robert

21   Raschke, a vocational expert ("VE"), also testified. (AR 19.) The ALJ denied Ms. Washington's

22   request on May 19, 2014, finding that Ms. Washington had not been under a disability as defined

23   in the Social Security Act from January 18, 2012, through the date of the decision. (AR 38-39.)

24   Ms. Washington timely requested review of the ALJ's ruling on July 17, 2014. (AR 7-10.) The

25   Appeals Council denied Ms. Washington's request for review on January 30, 2015. (AR 1.)

26       Ms. Washington timely sought judicial review of the final decision denying her SSI benefits.

27   (Complaint, ECF No. 1.) On June 29, 2015, the Commissioner answered the complaint. (Answer,

28   ECF No. 14.) On July 24, 2015, Ms. Washington filed her motion for summary judgment.

United States District Court
Northern District of California

(Motion, ECF No. 16.) The Commissioner filed an opposition and cross-motion for summary judgment on August 21, 2015. (Cross-Motion, ECF No. 17.) On September 4, 2015, Ms. Kennedy filed a response. (Response, ECF No. 19.)

**2. Summary of Record and Administrative Findings**

**2.1. Work History**

Ms. Washington was a certified nursing assistant. She reported that she did not go to school for the nursing certificate; her California employer simply filled out paperwork for her to receive the certificate. (AR 533.) She has worked primarily in nursing homes. (AR 281-290.) Ms. Washington appears to have last worked in 2010. (AR 259.) She received unemployment benefits in December 2011-February 2012. (AR 248.) Ms. Washington applied for disability benefits on at least two prior occasions. (AR 259-60.) These applications were denied. (*Id.*)

**2.2 Medical Evidence**

**2.2.1 Dr. Frank Chen, SSI Consultative Internal Medicine Examiner**

On September 9, 2010, Dr. Chen performed a physical examination of Ms. Washington at the request of the Social Security or Medi-Cal Disability agencies. (AR 380.) Dr. Chen examined Ms. Washington and reviewed her medical records from January 2009 to March 2010. (*Id.*) Dr. Chen reported that Ms. Washington's chief complaint was chronic pain of her right elbow. (*Id.*) He stated that she had been experiencing pain in her right elbow and right wrist for about six months prior to his evaluation, that she had been diagnosed with tendonitis, and that she was being treated with Valium and Motrin. (*Id.*) Ms. Washington appeared at the appointment using a right arm sling. (*Id.*) Dr. Chen noted that Ms. Washington's past medical history included Hepatitis C and depression. (*Id.*) Ms. Washington reported no smoking or drinking. (*Id.*)

Dr. Chen noted that Ms. Washington had last worked about eight months prior to the examination. (*Id.*) Ms. Washington reported that she watched TV, used a computer, listened to music, read, and took walks. (*Id.*) She did not do any housework. (*Id.*)

Dr. Chen opined that Ms. Washington could stand, walk and sit for six hours in an eight-hour workday. (AR 381.) He also stated that she could lift and carry 20 pounds occasionally and 10 pounds frequently. (*Id.*) Dr. Chen found no other functional limitations on a medical basis. (*Id.*)

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Dr. Chen referred Ms. Washington for an X-ray. (*Id*.) The X-ray report did not show anything

2    abnormal. (AR 382.)

3    **2.2.2 Alameda County Medical Center, Treatment Providers**

4    On August 4, 2010, Ms. Washington saw Nurse Practitioner Rita Davis-Marten at the

5    Alameda County Medical Center. (AR 389.) She reported that for six months, she had been having

6    problems with her right arm. (*Id*.) The doctor noted tendonitis and that Ms. Washington was using

7    an arm sling. The doctor prescribed Motrin and Valium and referred Ms. Washington for EMG

8    and MRI tests. (*Id*.) The notes state that Ms. Washington had no alcohol or street drug use. (*Id*.)

9    Ms. Washington had a follow-up appointment scheduled for August 30, 2010, which she did not

10   keep. (AR 391.)

11   On September 29, 2010, Ms. Washington had an MRI on her right hand. The MRI report by

12   Dr. Farhad Sani states that Ms. Washington had "nonspecific fluid adjacent to the radiocarpal

13   joint" and in the "triangular fibrocartilage complex." The report states that an "[u]nderlying TFCC

14   tear could be considered in the appropriate clinical setting." (*Id*.)

15   Ms. Washington saw Dr. Adrian James at Alameda County Medical Center on January 19,

16   2011. (AR 393.) The treatment notes state that Ms. Washington had a history of chronic

17   bronchitis, Hepatitis C, and neuropathy in her right hand. (*Id*.) The notes say that the sensation in

18   her right hand was grossly intact but that she had decreased grip strength. (*Id*.) The doctor

19   continued Ms. Washington on Motrin and Valium and started her on Neurontin. (*Id*.) The doctor

20   also referred Ms. Washington for a nerve conduction study. (*Id*.) The notes indicate no street drug

21   use but noted alcohol use. (*Id*.) The notes state that Ms. Washington is walking for exercise. (*Id*.)

22   Ms. Washington saw Dr. James again on April 6, 2011. (AR 395.) Ms. Washington reported

23   that she still had a burning sharp pain in her right arm and that her hand was still weak. (*Id*.) There

24   was no change in her condition compared to the last visit. (*Id*.) Ms. Washington's right hand grip

25   strength was still decreased, but her sensation was still grossly intact. (*Id*.) Dr. James stated that

26   Ms. Washington was not taking the Neurontin. Dr. James noted that Ms. Washington was

27   experiencing anxiety and chronic bronchitis. (*Id*.) Dr. James also noted that Ms. Washington was

28   not using street drugs, but was using alcohol. (*Id*.) She was dancing for exercise. (*Id*.)

Ms. Washington had an appointment on April 22, 2011, Dr. McCleary in the Eastmont Medical Center Women's Department, which she did not keep. (AR 411.) On April 26, 2011, Dr. McCleary sent Ms. Washington's lab test results to Ms. Washington's regular treatment provider. (AR 411.)

Dr. James saw Ms. Washington on July 6, 2011. (AR 397.) Ms. Washington was still experiencing tingling and numbness in her right arm. (*Id.*) The doctor continued Ms. Washington on Valium. (*Id.*) Dr. James continued her diagnoses of neuropathy, chronic obstructive pulmonary disease, and anxiety. (*Id.*) Ms. Washington reported that she was walking daily for exercise. (*Id.*) She also reported both alcohol and marijuana use. (*Id.*)

### 2.2.3 San Leandro Hospital Emergency Room, Treatment Providers

Ms. Washington went to the San Leandro Hospital Emergency Room on March 6, 2011, complaining of a cough, congestion, and a sore throat. (AR 463.) Dr. Schneider, the treating physician, diagnosed her with pharyngitis and prescribed antibiotics and cough medicine. (*Id.*)

On March 18, 2010, Ms. Washington went to the San Leandro Hospital Emergency Room. (AR 547.) She told the doctor that she had been exposed to gonorrhea and chlamydia, but refused to have a pelvic examination and would not permit the doctors to take blood to test her for HIV or syphilis. (*Id.*) The doctor treated Ms. Washington for her alleged exposure. (AR 548.)

Ms. Washington returned to the Emergency Room on March 26, 2010 with a laceration on her finger and a sore throat and dry cough. (AR 549.) Dr. Schneider treated her with a tetanus shot and cough medication. (*Id.*)

On June 15, 2010, Ms. Washington went to the San Leandro Hospital Emergency Room complaining of right arm pain. (AR 550.) She told the physicians that the pain had just started and that it was exacerbated by lifting any object. (*Id.*) Dr. Chiu treated Ms. Washington with a prescription for Motrin and Vicodin and placed her arm in a sling. (AR 550-51.)

Ms. Washington returned to the ER on July 9, 2010, still complaining of right arm pain. (AR 552.) The doctor diagnosed Ms. Washington with tendonitis and again treated her with Motrin, Vicodin and a sling. (*Id.*) A few weeks later on July 28, 2010, Ms. Washington returned complaining of pain in her right elbow. (AR 553.) Dr. Schneider again prescribed Motrin and

United States District Court
Northern District of California

1    Valium. (AR 554.)

2        On February 14, 2011, Ms. Washington saw Dr. Keaney at the San Leandro Hospital

3    Emergency room. (AR 555.) She again reported that her partner had been exposed to gonorrhea

4    and that she needed to be treated. (*Id.*) Ms. Washington did not wish to be examined. (*Id.*) The

5    doctor treated her for her alleged exposure. (*Id.*)

6        On April 9, 2011, Ms. Washington went to the San Leandro Hospital Emergency Room for

7    treatment of an upper respiratory infection. (AR 462.) She complained of a cough, a cold, and a

8    sore throat. (*Id.*) Dr. Schneider diagnosed Ms. Washington with pharyngitis and prescribed Z-Pack

9    (an antibiotic) and Guaifenesin (a cough medicine). (*Id.*)

10       Ms. Washington sought treatment at the San Leandro Hospital Emergency Room on June 22,

11   2011, complaining of dull left side pain and left pelvic pain from having fallen four times on a wet

12   floor four days previously. (AR 455.) Ms. Washington had a laceration and a lump on her left arm.

13   (AR 454.) She also had blood in her urine. (*Id.*) Ms. Washington reported to the doctor that she

14   had a history of seizures, tendonitis with chronic pain, and carpal tunnel syndrome. (AR 455.) Dr.

15   Schneider diagnosed Ms. Washington with multiple contusions secondary to the fall and a urinary

16   tract infection. (AR 456.) He prescribed Vicodin for the pain and Keflex for Ms. Washington's

17   urinary tract infection. (AR 455.)

18       Dr. James Keaney saw Ms. Washington in the San Leandro Hospital Emergency Room on

19   November 21, 2011. (AR 447.) Ms. Washington complained that she had been exposed to a

20   sexually transmitted disease. (*Id.*) She wanted to be treated but did not want to be examined. (*Id.*)

21   Ms. Washington reported to the doctor that she had a history of seizure activity, tendonitis with

22   chronic pain, and carpal tunnel syndrome. (*Id.*) Dr. Keaney treated Ms. Washington for her alleged

23   exposure to sexually transmitted diseases. (*Id.*)

24       Ms. Washington saw Dr. Schneider in the San Leandro Hospital Emergency Room on

25   February 16, 2012. (AR 442.) Ms. Washington's chief complaint was that she had been coughing

26   and wheezing for three days. (*Id.*) Ms. Washington also complained of some chest pain with the

27   coughing, a runny nose, ear congestion, and a sore throat. (*Id.*) Dr. Schneider noted that Ms.

28   Washington's past medical history included hypertension, asthma, anxiety, a heart murmur, and a

United States District Court
Northern District of California

head injury on December 24, 2011. (*Id*.) Ms. Washington reported that her boyfriend had been diagnosed with gonorrhea and chlamydia. Ms. Washington stated that she drinks alcohol occasionally but denied drug use. (*Id*.)

Dr. Schneider examined Ms. Washington and found everything to be within normal ranges. (*Id*.) He also found that she had very mild bilateral right lower quadrant and left lower quadrant tenderness but a full range of motion of her bilateral upper and lower extremities. (AR 443.) Dr. Schneider diagnosed Ms. Washington with an upper respiratory infection and exposure to a sexually transmitted disease. (AR 444.) Dr. Schneider prescribed albuterol and Robitussin and treatment for Ms. Washington's reported exposure to chlamydia. (AR 443, 445.) He referred Ms. Washington to the physician's assistant to perform a pelvic examination. (*Id*.)

Ms. Washington went to the San Leandro Hospital Emergency Room on May 23, 2012. (AR 429-441.) Ms. Washington's chief complaints were strep throat, a cold, and left arm pain. (AR 431.) Ms. Washington reported a sore throat, one week of intermittent chest and left arm pain, and a rash on her arms. (*Id*.)

Ms. Washington reported that she had asthma, depression, and anxiety and that she was taking medication for her asthma and for depression. (*Id*.) Ms. Washington said that she drank occasional alcohol. (*Id*.) She denied drug use. (*Id*.) The treatment notes state that Ms. Washington appeared fatigued but in no apparent distress. (AR 432.) Ms. Washington had left shoulder and left upper arm tenderness, which was worse with movement. (*Id*.) Ms. Washington also had a flattened affect but denied suicidal or homicidal ideation. (*Id*.)

Dr. Graham, the treating physician, stated that Ms. Washington had strep throat, a headache, chest pain with a cough, and left arm and left leg pain. (AR 429.) Ms. Washington told Dr. Graham that she usually sees Dr. Schneider and that he "gives her medicine and then she goes home." (*Id*.) Dr. Graham sent Ms. Washington for a chest x-ray and an EKG, both of which came back normal. (*Id*.) Dr. Graham diagnosed Ms. Washington with pharyngitis, bronchitis, chest wall pain, and a rash and prescribed Norco (a pain reliever) and Benadryl for the rash. (*Id*.)

On July 4, 2012, Ms. Washington went to the emergency room at San Leandro Hospital. (AR 427.) She reported that she had fallen in a store the night before and complained of pain in her left

United States District Court
Northern District of California

thigh, left buttock, and left arm. (*Id*.) Ms. Washington denied any drug use and stated that she drank about one beer a week. (*Id*.) Dr. Schneider examined Ms. Washington and found that Ms. Washington had the "full range of motion of her entire upper and lower extremities." (*Id*.) He prescribed Motrin and Tylenol and instructed her to follow up with her primary care physician within a week if her symptoms had not improved. (*Id*.)

Ms. Washington sought treatment at the emergency room at San Leandro Hospital on October 5, 2012, for abdominal pain. (AR 472.) She told the treating physician, Dr. Dallafior, that she "was sent [to the emergency department] to get treated for gonorrhea and chlamydia" as her sexual partner tested positive for those diseases. (*Id*.) The doctor treated Ms. Washington for her exposure to gonorrhea and chlamydia. (AR 474.)

Ms. Washington next went to the emergency room at San Leandro Hospital on October 17, 2012. (AR 469.) She complained of a headache, stuffy nose, sore throat, and a cough at night. (*Id*.) Ms. Washington reported that she had a history of bronchitis, anxiety, depression, and congestion. (*Id*.) Ms. Washington told Dr. Cook that when she went to the emergency department she was always prescribed Z-pack and cough medication. (*Id*.) Dr. Cook diagnosed Ms. Washington with a viral illness or possible allergic rhinitis. (AR 471.) Dr. Cook explained to Ms. Washington that she felt Ms. Washington's infection was viral and she encouraged Ms. Washington to try over-the-counter medications. (*Id*.) Ms. Washington became tearful and agitated and stated that she did not think the doctor "was caring for her appropriately because she was too beautiful." (*Id*.) The doctor recommended over-the-counter medications and also wrote Ms. Washington a prescription for antibiotics. (*Id*.)

### 2.2.4 Dr. Faith Tobias, SSI Psychological Disability Evaluator

On March 10, 2011, Dr. Tobias performed a psychological disability evaluation of Ms. Washington. (AR 384-87.) Dr. Tobias interviewed Ms. Washington, performed a mental status examination, and administered the Weschler Adult Intelligence test, the Weschler Memory Scale test, and the Bender-Gestalt test. (AR 384.) Dr. Tobias also reviewed records from the San Leandro Hospital Emergency Department from 2009 and 2010. (*Id*.)

Ms. Washington reported to Dr. Tobias that she had right hand and arm pain and had sought

treatment for these at the emergency room. (*Id*.) When Dr. Tobias asked Ms. Washington about her psychiatric symptoms, Ms. Washington stated that she felt depressed due to pain in her right hand and because no one believed that she had pain. (AR 384, 386.) Ms. Washington reported that she was receiving treatment for her pain. (AR 386.) Ms. Washington also reported insomnia and feelings of "paranoia" possibly related to a break-in of her former apartment. (AR 384.) Ms. Washington did not report any other psychiatric symptoms to Dr. Tobias. (*Id*.)

Ms. Washington reported to Dr. Tobias that she was unable to work due to right hand and right arm pain. (*Id*.) Ms. Washington stated that she had been hospitalized in Texas due to depression and suicidality, but she could not recall the name of the hospital or the dates of treatment. (*Id*.) Ms. Washington also was not able to recall receiving any mental-health treatment counseling or psychotropic medication. (*Id*.) In terms of her medical history, Ms. Washington reported Hepatitis C, arthritis, and headaches in addition to her right hand and arm pain. (AR 385.) Ms. Washington denied any significant drug or alcohol use. (*Id*.)

Ms. Washington appeared at the evaluation nicely dressed, with her hair neatly styled and with fashionably manicured fingernails. (*Id*.) When asked about her activities of daily living, Ms. Washington told Dr. Tobias that when she felt up to it, she was able to prepare simple meals, do light household chores, do light shopping, and take public transportation. (*Id*.) She said that she sometimes required the assistance of her niece to wash and dress. (*Id*.) Ms. Washington managed her own finances. (*Id*.) She reported socializing with family, doing errands with her nieces, attending doctor's appointments, watching TV, listening to music, taking naps, and occasionally attending religious activities. (*Id*.)

Ms. Washington stated that she could not complete any writing tasks because of her hand and arm pain. (*Id*.) Dr. Tobias therefore administered only tasks that did not require Ms. Washington to use her right hand. (*Id*.) Dr. Tobias noted that on the tests Ms. Washington did complete, she "engaged in many behaviors suggestive of decreased motivation and effort." (*Id*.) Dr. Tobias noted that Ms. Washington stalled on timed tests, provided approximate answers, and at times failed to correctly complete even simple test items. (*Id*.) While Dr. Tobias reported the results of Ms. Washington's tests, Dr. Tobias stated that "[d]ue to [Ms. Washington's] decreased motivation and

effort," the test results were invalid. (*Id.*)

Dr. Tobias noted that Ms. Washington's affect was restricted and that her mood ranged from neutral to mildly depressed to mildly irritable. (AR 386.) Dr. Tobias stated that Ms. Washington's clinical presentation and self-reporting raised the question of an adjustment disorder with a depressed mood, but that due to Ms. Washington's decreased effort on the test, her "self-reported psychiatric symptoms should be considered with caution and should be verified through outside sources." (*Id.*) Dr. Tobias diagnosed Ms. Washington with malingering cognitive symptoms and ruled out adjustment disorder with depressed mood. (*Id.*) Dr. Tobias found that Ms. Washington's clinical presentation was not suggestive of any significant cognitive deficits. (AR 387.)

From a strictly cognitive and emotional standpoint, Dr. Tobias found that Ms. Washington had the ability to do the following with no impairment: follow/remember simple instructions; maintain adequate pace or persistence to perform one or two step simple repetitive tasks; maintain adequate attention/concentration; and adapt to changes in job routine. (*Id.*)

Dr. Tobias found that Ms. Washington had the ability to do the following with no or mild impairment: withstand the stress of a routine work day; maintain emotional stability/predictability; and interact appropriately with co-workers, supervisors, and the public on a regular basis. (*Id.*) Dr. Tobias stated that she was unable to determine Ms. Washington's ability to follow/remember complex or detailed instructions, or her ability to maintain adequate pace or persistence to perform complex tasks, due to Ms. Washington's decreased motivation and effort during the tests. (*Id.*) Dr. Tobias was similarly unable to ascertain Ms. Washington's ability to manage funds due to her decreased effort on the cognitive tasks. (*Id.*)

Dr. Tobias stated that Ms. Washington's "main obstacle to adequate work performance appears to be her medical condition" and that she deferred evaluation on that ground to medical opinions. (*Id.*)

### 2.2.5 Eastmont Wellness Center, Treatment Provider

On June 4, 2012, Ms. Washington went to the Eastmont Wellness Center to have forms completed as part of her application for General Assistance benefits. (AR 494.) Ms. Washington met with Dr. Barnett. (AR 495.) Ms. Washington stated that she could not work because of stress

United States District Court
Northern District of California

and an inability to get along with other people. (AR 494.) Ms. Washington also reported that she had pain on a level ten out of ten and that she had pain in her left arm for which she had been seen in the emergency room a week before. (AR 495.) Dr. Barnett advised Ms. Washington to schedule a follow-up visit with Dr. James at the West Oakland Health Center. (*Id*.)

Ms. Washington went to the Eastmont Wellness Center on October 25, 2012. (AR 489.) She met with nurse practitioner Sharonne Rogers. (AR 493.) Ms. Washington stated that she had been hit in the head in December 2011 and had been having headaches since then. She reported that she had recently started having seizures, had experienced two seizures, and reported a migraine headache. (AR 489.) She said that she drank three glasses of alcohol a day and denied any illicit drug use. (AR 490.) She reported her pain at a level nine on a scale of zero to ten. (AR 491.) Ms. Rogers noted that Ms. Washington's memory was intact, she was oriented to time, place, person, and situation, and she demonstrated an appropriate mood and affect, had normal insights, and exhibited normal judgment. (*Id*.) Ms. Rogers prescribed Tramadol for Ms. Washington's headaches. She scheduled Ms. Washington for general medicine, gynecology, and vision examinations. (AR 492.) Ms. Rogers also advised Ms. Washington that the next time she had a seizure, she should call 911 or go to the hospital. (*Id*.)

On December 5, 2012, Ms. Washington went to the Eastmont Wellness Center and met with physician's assistant Talitha Marty. (AR 485-488.) Ms. Washington exhibited disjointed, pressured tangential thoughts. (AR 485.) She was unable to clearly give any information about her past psychiatric history. (*Id*.) Ms. Washington admitted to drinking two beers daily. (*Id*.) Ms. Washington denied using street drugs but stated that she "buys what she needs" when she needs it. (*Id*.) Ms. Marty referred to Ms. Washington's reporting as nonsensical. (*Id*.)

Ms. Marty reported that Ms. Washington had anxiety and a problem coping. (AR 486.) Ms. Washington reported her pain as zero on a scale of zero to ten. (AR 487.) Ms. Washington demanded medication. Ms. Marty noted that Ms. Washington used profanity in making her demand. (*Id*.) Ms. Marty stated that Ms. Washington was "highly inappropriate throughout the visit." (*Id*.) Ms. Marty referred Ms. Washington to psychiatry and also to a social worker. (*Id*.) Ms. Washington was angry and left before the referrals could be completed, stating that she only

needed pain medication. (AR 488.)

Melissa Attia, LCSW, met with Ms. Washington on February 1, 2013, to perform a psychiatric evaluation and to set up treatment. (AR 482, 484.) Ms. Washington was agitated throughout the interview and was unwilling to provide information. (*Id*.) From the time she entered the office Ms. Washington began to curse and was disruptive. (*Id*.) Ms. Washington told Ms. Attia that if Ms. Washington's primary care provider would no longer prescribe pain medication, she no longer wanted to see her. (*Id*.) Ms. Washington reported drinking three glasses of alcohol a day but denied illicit drug use. (AR 483.)

Ms. Washington alluded to the fact that she was having suicidal ideation and when Ms. Attia pressed her to be honest in her answers so that she could receive the appropriate care, Ms. Washington began arguing with Ms. Attia in an aggressive way. (*Id*.) Ms. Attia asked Ms. Washington to leave because of her aggressive behavior. (*Id*.) Ms. Washington cursed at Ms. Attia and left. (*Id*.) On her way out she was disruptive in the waiting room again. (*Id*.)

### 2.2.6 Dr. Rose Lewis -DSS Consultative Examiner

Dr. Lewis performed an internal medicine evaluation of Ms. Washington on April 15, 2013. (AR 506.) Dr. Lewis reviewed a function report and psychological evaluation dated March 10, 2011,which had been submitted to her from the Department of Social Services. (*Id*.) Dr. Lewis noted that Ms. Washington's chief complaints were left arm pain and asthma, but also noted that Ms. Washington stated that she was HIV positive and had Hepatitis C, hypertension, and seizures. (*Id*.) Ms. Washington told Dr. Lewis that she was very depressed and that her left arm hurt and that it had hurt for about six months prior to the examination. (*Id*.)

Dr. Lewis noted from the medical records that Ms. Washington had a history of asthma and bronchitis. Ms. Washington told Dr. Lewis that she used her inhaler four to five times a day, she could only walk a block without getting tired (although she could climb stairs slowly), and she wheezes at night. (*Id*.) Ms. Washington stated that her asthma was aggravated by dust, cleaning chemicals, car exhaust, dogs, and most plants. (*Id*.)

Ms. Washington told Dr. Lewis that she was taking Valium and was using an Abuterol inhaler. (*Id*.) She also reported that she drank up to thirty beers a day and that she rarely used marijuana.

United States District Court
Northern District of California

(*Id.*) As to her activities of daily living, Ms. Washington told Dr. Lewis that she could take care of her own personal needs and could do all household chores including vacuuming, mopping, sweeping, dusting, laundry, and dishes, although sometimes her left arm ached and she could not do it. (*Id.*) Ms. Washington told Dr. Lewis that during the day she sat home and cried and watched television because she was depressed. (*Id.*) Ms. Washington also cried during the examination and complained of being depressed. (*Id.*)

Dr. Lewis diagnosed Ms. Washington with asthma, chronic pain of the left arm of uncertain etiology, and untreated hypertension. (AR 508.) Dr. Lewis stated that Ms. Washington could stand and walk up to four hours and could sit without limitations. (*Id.*) Dr. Lewis found that Ms. Washington could lift and carry up to 50 pounds occasionally and 25 pounds frequently. Ms. Washington could frequently do the following: climb; balance; stoop; kneel; crouch; crawl; handle; finger; and feel. (*Id.*) She could only occasionally reach because of the decreased range of motion in her left shoulder and decreased grip. (*Id.*) Dr. Lewis stated that Ms. Washington was limited in her ability to work at heights and around heavy machinery because of her decreased range of motion of her left shoulder, decreased grip, and exertional dyspnea. (*Id.*) Dr. Lewis found that Ms. Washington had a limitation on working with chemicals and dust, fumes, and gasses because of her asthma. (*Id.*) Dr. Lewis did not impose any limitations on Ms. Washington's ability to work in extremes of temperature or around excessive noise. (*Id.*)

### 2.2.7 Dr. Tania Shertock -- DSS Examining Psychological Evaluator.

Dr. Shertock performed a psychological evaluation of Ms. Washington on April 20, 2013, at the request of the Department of Social Services. (AR 510.) (*Id.*) Dr. Shertock met with Ms. Washington. She also reviewed medical records from Dr. Chen, Dr. Lendon, and Dr. Schneider.[2] (*Id.*) Dr. Shertock found Ms. Washington to be generally cooperative throughout the session and also found her to be a reliable historian. (AR 510, 512.)

Ms. Washington reported that she has had seizures since she was a teenager. (AR 510.) She reported that she had been diagnosed with HIV/AIDS. (*Id.*) Ms. Washington told Dr. Shertock that

---

[2] Dr. Lendon's medical reports do not appear to be part of the administrative record.

1  she "had a suicide attempt after falling off the porch backwards after taking a lot of pills." (*Id.*)

2  Ms. Washington also reported that she had a history of psychiatric hospitalization in her teens in

3  Texas, had not had outpatient psychotherapy, and continued to have suicidal ideation. (*Id.*)

4      Ms. Washington told Dr. Shertock that she had completed the seventh grade and that her last

5  employment was at a nursing home in 2000. (AR 511.) Ms. Washington told Dr. Shertock that she

6  had not worked at all since 2000 because of her seizures and because "'she cannot get along with

7  folks.'" (*Id.*) Ms. Washington reported to Dr. Shertock that she smoked marijuana and drank as

8  much as she could to "ease the pain." (*Id.*) Dr. Shertock found Ms. Washington tearful and

9  depressed. (*Id.*) Ms. Washington repeatedly stated during the evaluation that she wished she were

10  dead. (*Id.*) Ms. Washington reported hallucinations. (*Id.*) As for her activities of daily living, Ms.

11  Washington told Dr. Shertock that she was adequately able to handle hygiene and grooming,

12  household duties, and keeping appointments. (AR 512.) She also stated that she had no motivation

13  or interest in doing anything. (*Id.*) Ms. Washington described her relations with supervisors and

14  co-workers as poor and her relations with others as very poor. (*Id.*)

15      Dr. Shertock diagnosed Ms. Washington with PTSD, major depression, and borderline

16  personality disorder. (*Id.*) She found Ms. Washington to be "functioning in the borderline range."

17  (*Id.*) Dr. Shertock relayed Ms. Washington's report of a history of anger, depression and anxiety,

18  and polysubstance abuse. (*Id.*) Dr. Shertock stated that it was "unclear to what extent [Ms.

19  Washington's] past or present psychiatric symptoms may be due to, or exacerbated by, her

20  substance use. She is not receiving treatment for her psychiatric symptoms. It is recommended that

21  [Ms. Washington's] psychiatric diagnosis and symptom severity be verified though examination

22  of medical records from past or present treatment providers." (*Id.*)

23      As for Ms. Washington's cognitive functioning, Dr. Shertock found that based on her

24  observation as well as Ms. Washington's pattern of performance, Ms. Washington's overall

25  intellectual functioning was in the borderline range and her memory functioning was impaired.

26  (*Id.*) Dr. Shertock found that Ms. Washington was capable of understanding, remembering, and

27  carrying out simple instructions. (*Id.*) Dr. Shertock found that Ms. Washington had a moderate

28  impairment in the following areas: understanding, remembering, and carrying out complex

United States District Court
Northern District of California

instructions; maintaining attention and concentration for the duration of the evaluation; maintaining adequate pace while completing tasks; withstanding the stress of an eight-hour day; maintaining adequate persistence while completing tasks; and enduring the stress of the interview. (*Id.*) Dr. Shertock found Ms. Washington to have a marked impairment in her ability to adapt to changes in routine work-related settings. Dr. Shertock stated that Ms. Washington had been unable to interact appropriately with her during the interview. Between that observation, and Ms. Washington's reported history, Dr. Shertock found Ms. Washington's ability to interact with the public, supervisors and co-workers to be questionable. (AR 513.) Dr. Shertock found that from a psychiatric standpoint, Ms. Washington's prognosis was poor. (AR 513.)

### 2.2.8 Dr. Hillary Weiss - SSI Consulting Examiner

The Social Security Administration asked Dr. Weiss to review Ms. Washington's medical records and to render an opinion as part of Ms. Washington's request for reconsideration. (AR 108.) Dr. Weiss rendered her opinion on May 4, 2013. (AR 110.) Dr. Weiss noted that Ms. Washington had not alleged any new or worsened mental condition. (*Id.*) She also observed in her report that Ms. Washington was not in formal mental health treatment and was not taking medications for her mental condition. (*Id.*)

Dr. Weiss reviewed Ms. Washington's medical records, including her medical evaluation from December 2012 and her mental health examination of February 2013. (*Id.*) Dr. Weiss found overall that Ms. Washington appeared to have a mental impairment but that she was also currently dependent on alcohol and "likely other substances as well." (*Id.*) Dr. Weiss based this finding on Ms. Washington's report that she drank thirty beers a day. Dr. Weiss relied on Ms. Washington's report of substance use to conclude that such use "help[ed] to explain why some of her [primary care physician] exams present an overall normal mental status, while others show evidence of impairment." (*Id.*) Dr. Weiss found Ms. Washington's self-reporting of her mental status as "not consistent across the evidence." She pointed to the fact that there were medical examinations on file where Ms. Washington presented without any significant emotional or behavioral impairments, and she specifically pointed to treatment that Ms. Washington received in Alameda and San Leandro during the period July to November 2012. (*Id.*)

1   Dr. Weiss diagnosed Ms. Washington with affective disorders, personality disorders, and

2   alcohol and substance addiction disorders. (AR 111.) She found that Ms. Washington had

3   moderate restrictions on the following: the activities of daily living; maintaining social

4   functioning; and maintaining concentration, persistence, or pace. (*Id.*) Dr. Weiss found that there

5   was insufficient evidence in the record to conclude whether Ms. Washington had experienced

6   repeated episodes of decompensation. (*Id.*)

7   Dr. Weiss also found that the medical evidence alone did not support Ms. Washington's

8   statements about the intensity, persistence, and functionally limiting effects of her symptoms. (AR

9   113.) She found Ms. Washington's statements in this regard to be "partially credible." Ms.

10  Washington had no limits on her ability to understand and to remember but had limitations on her

11  ability to sustain concentration and persistence. (AR 115.) Dr. Weiss determined that Ms.

12  Washington was not significantly limited in her ability in the following areas: carrying out very

13  short and simple instructions; sustaining an ordinary routine without special supervision; working

14  in coordination with or in proximity to others without being distracted by them; making simple

15  work-related decisions; asking simple questions or requesting assistance; and maintaining socially

16  appropriate behavior and adhering to basic standards of neatness and cleanliness. (AR 116.)

17  Dr. Weiss found Ms. Washington to have moderate limitations on her ability in the following

18  areas: carrying out detailed instructions; maintaining attention and concentration for extended

19  periods; performing activities within a schedule, maintaining regular attendance, and being

20  punctual within customary tolerances; completing a normal workday and workweek without

21  interruption from psychologically based symptoms; and performing at a consistent pace without

22  an unreasonable number and length of rest periods. (*Id.*) Dr. Weiss stated that Ms. Washington's

23  "mood and characterological" symptoms suggested a moderate limitation on concentration,

24  persistence, and pace, but that Ms. Washington was capable of concentration, persistence, and

25  pace for simple tasks on a sustained basis. (*Id.*)

26  Dr. Weiss determined that Ms. Washington was moderately limited in her ability to interact

27  appropriately with the general public, to accept instructions, and to respond appropriately to

28  criticism from supervisors, and in her ability to get along with coworkers or peers without

United States District Court
Northern District of California

distracting them or exhibiting behavioral extremes. (*Id.*) Dr. Weiss found that Ms. Washington was not significantly limited in her ability to ask simple questions or request assistance and in her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (*Id.*)

In terms of Ms. Washington's adaptation limitations, Dr. Weiss found Ms. Washington not significantly limited in her ability to do the following: be aware of normal hazards and take appropriate precautions; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (AR 117.) Dr. Weiss stated that Ms. Washington had a moderate limitation on her ability to respond appropriately to changes in the workplace.

### 2.2.9 Dr. Katherine Wiebe - Consulting Psychologist

On May 22, 2013, Ms. Washington met for three hours with Dr. Wiebe for a psychological evaluation. (AR 529.) Ms. Washington was referred to Dr. Wiebe by her counsel. (*Id.*) The only medical record Dr. Wiebe had available for review before the evaluation was the October 2009 Psychological Disability Evaluation of Dr. Tobias. (AR 530.) Dr. Wiebe's report notes that the validity of her opinion was affected by the following factors: the evaluation was limited in scope; it was based on one session with Ms. Washington in a structured environment; background information was provided primarily by Ms. Washington (a poor historian); and the lack of medical records to review. (*Id.*) Dr. Wiebe stated that Ms. Washington evinced erratic effort, required adaptation of the testing, and displayed other personality traits that affected her performance on tasks. (*Id.*) Ultimately, Dr. Wiebe concluded that the results of the assessment were valid given "the congruency of [Ms. Washington's] reporting and observations of her functioning with the testing and interview data, and with the record reviewed." (*Id.*)

Ms. Washington told Dr. Wiebe that she had received her certified nursing assistant certificate before she came to California, that she quit working in 2006 when she found out that her boyfriend had HIV and AIDS, and that she almost passed out at work. (AR 532.)

Dr. Wiebe reported that Ms. Washington had difficulty interacting with others due to her psychiatric and personality disorders. (*Id.*) Ms. Washington explained to Dr. Wiebe the circumstances regarding her outburst at the Eastmont Wellness Center. (AR 533.) Ms. Washington

told Dr. Wiebe that she wanted further psychotherapy and assistance and that she was concerned that she could not control her angry outbursts. (*Id*.) Ms. Washington agreed to follow up with psychiatric treatment. (*Id*.)

Ms. Washington told Dr. Wiebe that she did not use marijuana and that she had stopped drinking ten days before the meeting, but that she was going to "start drinking all kinda alcohol" so that she "can die." (AR 534.)

Dr. Wiebe found that Ms. Washington "evidenced symptoms of severe depression, anxiety, paranoid thinking, and multiple cognitive functioning problems including forgetfulness, and lapses in attention." (*Id*.) Dr. Wiebe further found that Ms. Washington was unable to manage her personal affairs and the activities of daily living due to her psychiatric symptoms and impaired judgment. (*Id*.) Dr. Wiebe noted that Ms. Washington evinced relational problems. (AR 535.) She also found that Ms. Washington experienced auditory and visual hallucinations and that she appeared internally preoccupied and that she reported suicidal ideation. (*Id*.)

In addition to interviewing Ms. Washington and reviewing Dr. Tobias's disability evaluation, Dr. Wiebe administered the following tests to Ms. Washington: the Barona Estimate; Trail Making A; selected items from the Mini Mental State Examination; the Montreal Cognitive Assessment; the Beck Depression Inventory; and the Beck Anxiety Inventory. (AR 536.)

Based on the testing, Dr. Wiebe estimated that Ms. Washington had below average IQ. (*Id*.) She found Ms. Washington's functioning in terms of attention/concentration and persistence to be severely impaired. (*Id*.) In her report Dr. Wiebe listed the results of the testing that supported her conclusion. (*Id*.) Dr. Wiebe also found Ms. Washington's executive functioning, including her ability to plan, sequence, abstract, and organize to be severely impaired. (*Id*.) Again, Dr. Wiebe included in the report the test results that supported her conclusion. (*Id*.) Similarly, Dr. Wiebe found Ms. Washington to have severe impairments in the areas of memory functioning, language, and visual/spatial ability. (AR 537.) Dr. Wiebe found Ms. Washington to have mild/moderate sensory-motor impairment and overall intellectual functioning impairment. (AR 542.) Dr. Wiebe noted that Ms. Washington's physical impairments could have additional psychiatric implications, but that this was outside the scope of her assessment. (*Id*.) Dr. Wiebe stated that Ms. Washington

United States District Court
Northern District of California

United States District Court
Northern District of California

1   was vulnerable to further decomposition under stress and that she would be unable to meet the

2   requirements for attendance at a job and could not understand, remember, or follow directions in a

3   work environment. (*Id.*)

4        Dr. Wiebe stated that the problems Ms. Washington manifested were consistent with

5   psychiatric and cognitive functioning problems "known to result from being victimized and

6   threatened in an abusive relationship" such as those Ms. Washington reported about her history to

7   Dr. Wiebe. (AR 541.)

8        Dr. Wiebe reiterated that the "validity of the assessment results is considered limited." (AR

9   542.) She therefore conditionally diagnosed Ms. Washington with the following: post-traumatic

10  stress disorder, which was chronic and severe; major depressive disorder, which was recurrent and

11  severe with psychotic symptoms; generalized anxiety disorder; a cognitive disorder; a learning

12  disorder; borderline personality traits; avoidant personality traits; depressive personality traits; and

13  negativistic personality traits. (*Id.*) Dr. Wiebe noted that Ms. Washington could be experiencing

14  effects from self-medicating and also from the use of anti-anxiety medication, which Ms.

15  Washington reported had been prescribed for her. (*Id.*) Dr. Wiebe ultimately concluded that while

16  Ms. Washington might improve with treatment, she would "likely remain unable to function in a

17  work environment for at least several years." (AR 543.)

18       **2.2.10 Dr. Michael Boroff –Psychological Evaluator/Treatment Provider**

19       Ms. Washington was evaluated by Dr. Boroff at the Alameda County Healthcare for the

20  Homeless TRUST Clinic on December 12, 2013, and on January 14 and 16, 2014. (AR 556.) Dr.

21  Boroff noted that Ms. Washington came to the clinic "in a state of crisis. (*Id.*) Ms. Washington

22  complained of severe depression as well as physical concerns including chronic pain, Hepatitis C,

23  and HIV. (*Id.*) Ms. Washington told Dr. Boroff that she often called 911 because she thought that

24  people were trying to kill her, that she had suicidal ideation, and that recently she had spent most

25  of her time hiding in a closet crying. (*Id.*) She also reported that she felt a frequent need to scratch

26  herself because she believed that she had a bug crawling in her skin. (*Id.*)

27       Dr. Boroff found that it was difficult to obtain information from Ms. Washington due to her

28  psychotic processes and her difficulty with trust. (*Id.*) In addition to speaking with Ms.

Washington, Dr. Boroff reviewed the available medical records, including the evaluation and examinations of Drs. Wiebe, Shertock, and Tobias, and the notes from the Eastmont Treatment Center. (*Id*.)

Dr. Boroff noted that it did not appear that Ms. Washington had received any lengthy psychological treatment. (AR 557.) He further noted that her attempts at treatment at the Eastmont Wellness Center had not been successful and often ended up with Ms. Washington being "verbally aggressive." (*Id.*)

Dr. Boroff performed a mental status examination. (*Id*.) He said that the initial session took twice as long as he had intended because Ms. Washington was psychotic and detached from reality, and it took time in order to stabilize her. (*Id*.) Dr. Boroff discussed psychiatric hospitalization with Ms. Washington at that initial meeting, but she threatened to run away and not return. (*Id*.) Dr. Boroff reported that his two subsequent sessions with Ms. Washington were "less challenging" and that in those sessions she presented as pleasant and cooperative. (*Id*.)

Dr. Boroff found Ms. Washington's hygiene questionable as she appeared at the second session wearing a shower cap, and at the third session, she showed him numerous rashes and skin lesions, which she was concerned were evidence of cancer or HIV (*Id*.) Ms. Washington claimed that she knew she had HIV because "she knows what it feels like to have it in her body." (*Id*.) Dr. Boroff also noted Ms. Washington's ongoing suicidal ideation. (*Id*.)

Dr. Boroff concluded that Ms. Washington experienced "such severe mental illness that she is generally unable to function in any aspect of her life." (*Id*.) He found her to be at high risk for self-harm and for harming others. (*Id*.) Dr. Boroff stated that Ms. Washington likely suffered from severe depression and that she met the criteria for PTSD and a Major Depressive Disorder, which was recurrent, severe, and had psychotic features. (*Id*.) Dr. Boroff acknowledged that prior evaluations cited low effort and guardedness by Ms. Washington, and Dr. Tobias diagnosed her with malingering; however, Dr. Boroff found that diagnosis "baseless and as a result of a clinician not taking the time or having the necessary perspective to help a severely traumatized and psychotic individual feel comfortable." (*Id*.) Dr. Boroff stated that in his interactions with Ms. Washington, once he established some degree of trust with her, she became easier to work with.

United States District Court
Northern District of California

(AR 557-58.) Dr. Boroff concluded that "[a]s things currently stand, it is impossible to imagine her working and providing for herself. She would be unable to attend a job with any regularity, would be unable to exhibit socially appropriate behavior, could not focus on job tasks, would require excessive supervision, and would be likely to exhibit volatility that would make keeping a job impossible." (AR 558.) He further stated that Ms. Washington was unlikely to experience any significant improvement in her functioning, even with appropriate treatment. (*Id*.) Dr. Boroff found that Ms. Washington's impairments would remain equally severe in the absence of substance use and that they were "completely unrelated to substance use." (AR 559.) He stated that her condition was expected to last at least 12 months and that she was not a malingerer. (*Id*.)

Dr. Boroff found Ms. Washington had extreme limitations in twelve separate areas as follows: understanding, remembering, and carrying out very short simple and complex instructions; maintaining attention and concentration for two-hour segments; maintaining regular attendance and being punctual within customary, usually strict tolerances; completing a normal workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; sustaining an ordinary routine without special supervision; accepting instructions and responding appropriately to criticism from supervisors; working with or near others without being unduly distracted or distracting them; interacting appropriately with co-workers and with the general public; responding appropriately to changes in a routine work setting; and dealing with normal work stressors. (AR 561.) In addition, Dr. Boroff concluded Ms. Washington had a marked limitation in her basic standards of neatness and cleanliness. (*Id*.) Moreover, Dr. Boroff found that Ms. Washington had extreme limitations in activities of daily living, social functioning, and concentration and pace, and four or more episodes of decompensation within a 12 month period. (AR 562.)

He anticipated that Ms. Washington's impairments would interfere with her concentration or pace of work on average 50% of the day. (*Id*.) Finally, Dr. Boroff concluded that "Ms. Washington is one of the most impaired individuals to come to this clinic and we serve severely mentally ill homeless clients. She needs a higher level of care just to remain safe." (*Id*.)

Ms. Washington returned to the TRUST Clinic for additional treatment sessions with Dr.

1    Boroff on March 25, 2014, April 8, 2014, and April 22, 2014. (AR 569.) He stated that her

2    condition was identical to that of her earlier visits and that he was concerned for her safety. (*Id.*)

3    Ms. Washington continued to display irrational and psychotic thought processes. (*Id.*) The doctor

4    noted that because of her psychosis, Ms. Washington would be eligible for a significant increase in

5    her General Assistance benefits "but due to her psychosis, she refuses to accept it." (*Id.*) Ms.

6    Washington reported that she was not sleeping at night because of paranoia and anxiety and she

7    appeared at each session looking "exhausted and unkempt." (*Id.*) Dr. Boroff stated that based on

8    his observations of Ms. Washington, it was his opinion that she "remains at high risk for self-

9    harm, and psychiatric hospitalization is likely an inevitability." (*Id.*) Dr. Boroff concluded that Ms.

10   Washington's functioning was impaired across all aspects of her life and that even many basic

11   activities of daily living were "daunting to her." (*Id.*)

12        Dr. Boroff saw Ms. Washington an additional time on May 6, 2014. (AR 570.) She continued

13   to fixate on the pain in her arm, was attempting to find a psychiatrist, and expressed interest in

14   taking medication to calm herself. (AR 570.)

15   **2.3 Written Testimonies**

16       **2.3.1 Ms. Washington's SSI Application**

17        In her application for benefits on February 11, 2012, Ms. Washington stated that she did not

18   need help in personal care, hygiene, or upkeep of the home. (AR 251.)

19        On her January 23, 2012 intake form, Ms. Washington reported that the highest grade she had

20   completed was the 11th grade. (AR 335.) She also reported that she had only had one job in the

21   last 15 years before she became unable to work. (*Id.*) She listed in her job history a position at

22   Jones Convalescent Home from January to September 2009, where she cleaned and folded towels

23   and helped patients. (*Id.*)

24        Ms. Washington reported that she had sought medical treatment for her hand at the West

25   Oakland Health Clinic and that she had also seen a doctor or received treatment for a mental

26   condition, although the form does not include any specifics about this treatment. (AR 336-37.)

27        As part of her application, Ms. Washington completed a function report on April 22, 2012.

28   (AR 340-47.) On that report, Ms. Washington listed her disabling conditions as seizures, high

United States District Court
Northern District of California

blood pressure, Hepatitis C, HIV, and AIDS. (*Id*.) She stated that her blood pressure was always high and that she had "seizures all the time," including in her sleep. (AR 341.) She reported that she was too weak most of the time to do anything. (*Id*.) In terms of personal care, Ms. Washington reported that she could dress herself slowly, use the toilet, care for her hair, and feed herself by microwaving frozen food. (AR 341-42.) Ms. Washington stated that her cooking habits had changed in that she was now too tired to cook and also that she was scared that she would have a seizure. (AR 342.)

In terms of housework, Ms. Washington stated that someone else did the housework because it was not her house. She reported that she could go out of the house alone but that she did not leave the house because she was scared of her seizures. (AR 343.) She stated that she did not shop often or for very long and that someone took her shopping. (*Id*.) In terms of social interaction, Ms. Washington reported that she sometimes talked with others when she felt "ok" and that sometimes she needed someone to accompany her because she was scared she might have a seizure. (AR 344.) She stated that she just wanted to be alone, that she had problems getting along with others, and that she was nervous. (AR 345.) She reported that her head hurt all the time. (*Id*.)

She stated that physically, she could not walk far because she was tired all the time and her head hurt all the time. (*Id*.) She could pay attention until her head started hurting from her high blood pressure. (*Id*.) Sometimes she could finish what she started. (*Id*.) She could follow instructions and get along with authority figures "ok." (AR 345-46.) Ms. Washington stated that she felt "down and out" and stressed, including being scared all the time that she could die from her high blood pressure and seizures. (*Id*.) She also stated that she could not remember much anymore. (AR 346.)

Ms. Washington used a brace or splint for her hand. (*Id*.) She also reported that her tongue hurt from biting it during seizures. (*Id*.) She stated that she took medications for dizziness and that she was concerned about the side effects of the medications on her liver and kidneys. (AR 347.) She reported being in pain and wishing she were dead. (*Id*.)

Ms. Washington filled out an additional disability report form on appeal on December 3, 2012. (AR 350-53.) She stated that she had no new physical or mental limitations and that there had not

United States District Court
Northern District of California

been any change in her condition since she had filled out the disability report form on January 23, 2012. (*Id*.) Ms. Washington reported that since the date of the January 2012 report, she had received additional treatment at the West Oakland Health Center for pain, carpal tunnel, and bronchitis, and she had received medication. (*Id*.) Ms. Washington stated that since the January 2012 report she had not seen any treatment provider for mental or emotional problems that limited her ability to work. (*Id*.) Ms. Washington stated that the only medication she was taking was Valium. (AR 352.)

On May 28, 2013, Ms. Washington filed an updated disability report on appeal. (AR 357-361.) She again reported no changes in her condition since the date of her last report, December 6, 2012. (AR 357.) She reported receiving additional general medical care in 2013 at the Eastmont Wellness from Dr. Sharonne Rogers. (AR 358.) Ms. Washington reported that she received medication for her asthma and for pain. (AR 359.) As it related to her activities, Ms. Washington stated that she was just "laying around," that she was not taking care of herself the way she used to, and that she was continuing to have problems. (*Id*.)

### 2.4 Administrative Hearing

#### 2.4.1 Plaintiff's Testimony

Ms. Washington appeared by telephone before the ALJ at the February 5, 2014 hearing.[3] (AR 70.) A medical expert, Dr. Brady Dalton, was also available to testify at the hearing by telephone. (*Id*.) The ALJ stated that due to the nature of the case, she needed to have Ms. Washington appear in person before her, so she postponed the hearing. (AR 71.) Before she adjourned the hearing, the ALJ questioned Ms. Washington briefly on background information such as her address, her educational background, and her work history. (AR 72-74.) Ms. Washington stated that she was not sure if she had completed the 11th grade. (AR 73.) Ms. Washington reported that she had last worked in 2008 or 2009 "or something." (AR 74.)

The ALJ then asked Ms. Washington why she was unable to work. (*Id*.) Ms. Washington

---

[3] Ms. Washington could not appear in person because she did not have valid identification to enter the hearing building.

United States District Court
Northern District of California

responded that "[e]verything was wrong with [her]." (*Id.*) She reported that she was paranoid and depressed and had an anger problem. (*Id.*) She stated that she had asthma and could "hardly lift her left arm" because her "bones are deteriorating." (AR 74-75.)

When the ALJ asked Ms. Washington whether she drank alcohol, she responded that she had not done so since 2001. (AR 75.) She stated that she used marijuana "whenever [she] could get it" and had smoked a joint two days before the hearing. (*Id.*) Ms. Washington denied using any other drugs. (AR 76.) She stated that she smoked one cigarette every other week. (*Id.*) Ms. Washington stated that she used Albuterol and that the doctor was going to prescribe some medication for her seizures. (*Id.*) The ALJ then adjourned the hearing until February 27, 2014. (*Id.*)

Ms. Washington appeared in person before the ALJ on February 27, 2014. (AR 47.) She was represented at the hearing by her counsel, Nancy McGee. (*Id.*) Vocational Expert, Robert Raschke appeared by phone. (*Id.*) The medical expert was not available to appear, and the ALJ did not choose to do any interrogatories or otherwise contact the medical expert, although Ms. Washington's counsel queried her in that regard. (AR 47, 66.)

The ALJ asked Ms. Washington to state her medical problems. (AR 49.) Ms. Washington stated that she had asthma, bronchitis, Hepatitis C, HIV, depression, anxiety, paranoia, and seizures. (*Id.*) When questioned, Ms. Washington admitted that she had never been tested for HIV. (*Id.*) The ALJ then asked Ms. Washington about her sleeping habits. (Id.) Ms. Washington stated that she slept during the day because she was scared to sleep at night because she was afraid that "everybody" was going to kill her. (AR 49-50.)

The ALJ asked Ms. Washington whether she did her own cooking and cleaning. (*Id.*) Ms. Washington responded that she tried "a little bit." (*Id.*) Ms. Washington stated that she babysat for her niece's children a few times, but on one occasion she got scared and hid in a closet. (*Id.*) Ms. Washington stated that this happened to her often. (*Id.*)

Ms. Washington told the ALJ that she was seeing Dr. Michael for her mental health problems but that it was not easy to go to see him because she did not trust him.[4] (AR 50-51.) The ALJ

---

[4] "Dr. Michael" appears from the record to be Dr. Michael Boroff.

United States District Court
Northern District of California

1    asked Ms. Washington how long she had been seeing Dr. Michael; Ms. Washington could not

2    recall, but agreed with the ALJ that it appeared that she had seen him about four times. (AR 51.)

3        Ms. Washington then said that it did not work for her to see the doctors at the Eastmont Mall

4    because she felt they had "turned against" her. (*Id.*) She said they would not let her see her

5    primary care doctor and then she would "get upset and cuss" and then walk out. (AR 52.) Ms.

6    Washington testified that she did not trust doctors generally as she thought that they are going to

7    give her something to hurt her. (*Id.*) Ms. Washington also stated that she heard voices "all the

8    time" and that they told her "all kinds of stuff" including to hurt herself and to hurt other people.

9    (AR 52-53.) Ms. Washington said she had bad dreams about when she had been raped. (AR 52.)

10    When that happened, she would get in the closet and hide. (AR 53.)

11        In terms of her physical pain, Ms. Washington said that she had pain in her left side and her

12    left arm. (*Id.*) She said she did not know what was causing the pain, but it had been there for a

13    while and it was getting worse. (*Id.*) She also stated that she had asthma and bronchitis and that

14    she woke up stuffed up, sneezing, and coughing. (AR 53-54.) As a result, she felt tired, sick, and

15    nauseated, and her head hurt. (AR 54.) Ms. Washington said that she had dreams about having

16    been raped by her uncles when she was young. (*Id.*)

17        Ms. Washington's attorney then asked her to explain a discrepancy in the record about her

18    schooling. (*Id.*) Ms. Washington said that she could not remember but that she thought her highest

19    level of schooling may have been in middle school, eighth grade. (*Id.*)

20        The questioning then turned to Ms. Washington's work experience. (AR 55.) Ms. Washington

21    said that the only work she had done was as a certified nursing assistant in nursing homes. (*Id.*)

22    She testified that her last work had been in 2009 or 2010. (*Id.*) Ms. Washington did not take a test

23    to become certified. A facility that she had worked for filled out the paperwork for her

24    certification and submitted it to the State of California. (*Id.*)

25        The ALJ asked Ms. Washington whether she had received any treatment for her Hepatitis C,

26    and Ms. Washington stated that she had not. (AR 57.) The doctor had prescribed medication for

27    Ms. Washington's seizures but Ms. Washington said that the medicine gave her migraines, and she

28    had stopped taking it in the week before the hearing. (*Id.*) Ms. Washington reported that she was

United States District Court
Northern District of California

taking medicine for her anxiety but that the medicine did not help. (AR 58.)

### 2.4.2 Testimony of the Vocational Expert, Robert Raschke

The ALJ then asked questions of the vocational expert. (*Id.*) The ALJ asked whether a person could perform Ms. Washington's past employment if they had her past work experience as a nursing assistant and he or she had the following limitations: (1) medium work; (2) lifting and carrying 50 pounds occasionally and 25 pounds frequently; (3) sitting without limits; (4) standing and walking for four hours; (5) frequently climbing ramps and stairs; (6) balancing, stooping, kneeling, crouching and crawling; (7) reaching overhead occasionally with the left upper extremity but otherwise reaching in all other directions; (8) frequently feeling and fingering and handling with the left upper extremity but with no limitations on the right; (9) no working at heights or around heavy machinery, extreme temperatures, dust, fumes, odors or gases; (10) limited to simple, routine work; (11) can maintain attention, concentration, persistence, and pace for two-hour increments; (12) can adapt to routine changes provided the changes are introduced gradually; and (13) can have only occasional interaction with co-workers and supervisors and no public contact. (AR 60-1.) The ALJ responded that this was not possible because Ms. Washington's past work was considered semi-skilled and the hypothetical limited the person to simple, repetitive work.

The VE stated that a person with the limitations stated in the hypothetical could perform the duties of a warehouse worker. (AR 61.) The VE stated that the number of available positions would be eroded by 50% because of the four-hour limitation on sitting, standing, and walking. (AR 62.) The VE also identified possible positions of industrial cleaner or cleaning and prep work for electronic equipment. (*Id.*) The VE reduced the number of available positions by 50% to account for no exposure to hazardous chemicals, but found the number of available positions was still significant. (*Id.*) The ALJ asked the VE if he could identify a third position. (AR 63.) The VE considered the question, saying that he "had some work to do on these medium jobs." (*Id.*) He then identified the position of equipment tester, particularly a bulb tester. (*Id.*) He first reduced the number of positions available by half to account for the fact that the position needed to be entry level and then eroded that number by 50% to account for limitations both on standing and

United States District Court
Northern District of California

1    exposure. (*Id.*)

2        The vocational expert stated that his testimony was consistent with the Dictionary of

3    Occupational Titles, except to the extent that he made determinations about erosion. (AR 64.) The

4    vocational expert stated that his statements about erosion were based on his four decades of

5    professional experience working in the field of disability and with employers in modifying jobs.

6    (*Id.*) The vocational expert added that he had training as an electronic technician and that training

7    provided a basis, in part, for his testimony on production and assembly work. (*Id.*)

8        The ALJ then changed the hypothetical as it related to concentration, persistence, and pace.

9    The ALJ asked the vocational expert to assume that the person could not maintain attention,

10   concentration, persistence, and pace for at least 20% of the day. (*Id.*) The vocational expert stated

11   that such a person could not perform any work. (*Id.*)

12       Counsel for Ms. Washington then questioned the vocational expert. (AR 65.) Counsel first

13   asked the vocational expert if he could cite to any articles to support his erosion numbers. (*Id.*)

14   The vocational expert stated that he could not. (*Id.*) Counsel then asked the vocational expert to

15   add to the hypothetical the limitation that the person could not interact appropriately with

16   supervisors or co-workers. (*Id.*) The vocational expert stated that there would be no positions for

17   that person. (*Id.*) Counsel then asked if there would be positions for a person who would miss

18   work for more than four days in a month. (*Id.*) Again, the vocational expert stated that such

19   absences would be "industrially unacceptable." (*Id.*)

20       **2.4.3 The ALJ's Findings**

21       Applying the sequential evaluative process, the ALJ held on May 19, 2014, that Ms.

22   Washington was not disabled under sections 216(i), 223(d) or 1614(a)(3)(A) of the Social Security

23   Act and was therefore not entitled to disability insurance benefits. (AR 39.)

24       At step one, the ALJ found that Ms. Washington met the insured status requirements of the

25   Social Security Act through December 31, 2015, and that she had not engaged in substantial

26   gainful activity since July 31, 2010. (AR 17.)

27       At step two, the ALJ found that Ms. Washington had severe impairments of hypertension,

28   polysubstance abuse, anxiety disorder, and mood disorder. (*Id.*) The ALJ found that the following

United States District Court
Northern District of California

1   impairments were not severe: (1) exposure to sexually transmitted diseases; (2) Hepatitis C; (3)

2   right arm pain; (4) tendonitis; (5) left arm and left side pain; (6) chronic obstructive pulmonary

3   disease/bronchitis; (7) headaches, and (8) HIV. (AR 18-19.)

4       At step three, the ALJ found that Ms. Washington did not have an impairment or combination

5   of impairments that met or medically equaled the criteria of listings 12.04, 12.06 or 12.09. (AR

6   19.) In making this determination the ALJ considered whether "paragraph B" criteria were

7   satisfied. The ALJ found that Ms. Washington did not meet the "paragraph B" criteria, requiring at

8   least two marked restrictions on the activities of daily living, maintaining social functioning,

9   maintaining concentration, persistence, or pace, or repeated episodes of decompensation (defined

10   as three episodes within one year each lasting for at least two weeks). (AR 19-20.)

11       The ALJ found that Ms. Washington had only moderate limitations on the activities of daily

12   living based on Ms. Washington's testimony that she babysat and cooked for her niece on

13   occasion, as well as from information from the consultative evaluations where Ms. Washington

14   stated that she could prepare simple meals, perform light household chores, perform light

15   shopping and take public transportation. (AR 20.)

16       The ALJ found that Ms. Washington had moderate difficulties in social functioning based on

17   the April 2013 consultative examination, which found that Ms. Washington was not able to

18   interact appropriately with the examiner and that her ability to interact with the public,

19   supervisors, and co-workers was questionable. (*Id.*)

20       The ALJ found Ms. Washington to have moderate difficulties in maintaining concentration,

21   persistence, or pace based on the findings of the state agency mental medical consultants (*Id.*) The

22   ALJ noted that during the 2011 examination, Ms. Washington had engaged in "behavior

23   suggestive of decreased effort." (*Id.*) The ALJ then considered the results of the April 2013

24   consultative evaluation, which found that Ms. Washington had moderate impairments in a number

25   of tasks related to concentration, persistence, and pace in making her determination of moderate

26   limitations. (*Id.*) The ALJ next found Ms. Kennedy had experienced no episodes of

27   decompensation of extended duration. (AR 20-21.)

28       The ALJ found that Ms. Washington did not meet the "paragraph C" criteria as there was no

United States District Court
Northern District of California

evidence of (1) repeated and extended periods of decompensation, (2) a likelihood of decompensation in response to changes in mental demands or environment, or (3) an inability to function outside of a highly supportive living arrangement. (AR 21.)

The ALJ further found that Ms. Washington's mental impairment did not meet or medically equal the criteria of listing 12.09 as there was no evidence of any behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system. (*Id.*)

At step four, the ALJ found, after consideration of the record including substance use disorders, that Ms. Washington had the residual functional capacity to perform medium work with the following limitations: lift and carry 50 pounds occasionally and 25 pounds frequently; sit without limitations; stand and walk for four hours; frequently climb ramps and stairs; frequently balance, stoop, kneel, crouch, and crawl; reach overhead occasionally with the left upper extremity but otherwise reach in all other directions; frequently feel, finger, and handle with the left upper extremity but with no such limitations on the right upper extremity; no work at heights or around heavy machinery or extreme temperatures; no concentrated exposure to dust, fumes, odors, or gases; limited to simple, routine work; can maintain attention, concentration, persistence, and pace for two-hour increments; can adapt to routine changes if the changes are introduced gradually; can have occasional interaction with co-workers and supervisors but no public contact; and cannot maintain attention and concentration for at least 20 percent of the workday. (AR 21-22.)

The ALJ reviewed the evidence in the record at length. (AR 22-25.) The ALJ first recited Ms. Washington's testimony that she suffered from depression, anxiety, paranoia, left arm and side pain, and an inability to raise her left arm, seizures, asthma, bronchitis, hepatitis C, and HIV. (AR 22.) The ALJ noted that Ms. Washington was reportedly taking medications for anxiety and seizures. (*Id.*) Ms. Washington acknowledged that she had never been tested for HIV. (*Id.*) The ALJ referenced Ms. Washington's testimony that she did not drink alcohol but that she used marijuana whenever she could get it, including in the days before the hearing. (*Id.*)

The ALJ next reviewed Ms. Washington's testimony that she was afraid to sleep at night for fear that someone would kill her, that she heard voices that would tell her to hurt herself or others, and that she would hide in the closet. (*Id.*) Ms. Washington was reportedly seeing Dr. Michael for

treatment of her mental health issues. (*Id.*) Her treatment by other doctors did not work out as she felt that everyone was against her and did not like her. (*Id.*)

The ALJ then reviewed the medical evidence in the record. (*Id.*) The ALJ made the observation that Ms. Washington received "rather limited and inconsistent treatment for the aforementioned medical conditions." (*Id.*) She stated that it would have been "reasonable to expect evidence of treatment for such physical conditions if the limitations imposed by those impairment[s] were as broad and limiting" as Ms. Washington alleged them to be. (*Id.*) Specifically, the ALJ found that the "absence of regular treatment" for right arm pain, bronchitis, hepatitis C, seizures, or headaches was inconsistent with severity of the functional limitations alleged by Ms. Washington and diminished the credibility of those allegations. (*Id.*) The ALJ therefore found that a residual functional capacity at less than the full range of medium exertional work was proper in light of medical evidence supporting a more restrictive finding. (AR 22-23.)

The ALJ next focused on Ms. Washington's limited mental health treatment. (AR 23.) In December 2012, Ms. Washington sought treatment for anxiety and explosive anger but did not provide the clinician with any history regarding her allegations of explosive anger. (*Id.*) Ms. Washington was highly inappropriate during the meeting, using four-letter words to demand medications and treatment but leaving before the clinician could make any referrals for her. (*Id.*) The ALJ also noted that Ms. Washington reported drinking two beers and day and denied illegal drug use but referenced buying what she would need on the street. (*Id.*)

In the February 2013 psychiatric evaluation, Ms. Washington would not answer questions. (*Id.*) She stated that she drank three glasses of alcohol a day but denied illicit drug use. (*Id.*) Ms. Washington was disruptive during the interview and in the waiting room. (*Id.*)

The ALJ found as credible Ms. Washington's allegations of inability to sleep at night and auditory hallucinations. (*Id.*) The ALJ credited Ms. Washington's testimony at the hearing that she used marijuana, and also credited Ms. Washington's reports to medical providers that she used alcohol on a daily basis. (*Id.*) The ALJ also noted that Ms. Washington received limited mental health treatment, but that at the treatment sessions she did attend, she displayed disruptive, aggressive, or angry behavior. (*Id.*)

The ALJ concluded that including consideration of Ms. Washington's substance use disorder, she should be limited to simple, routine work with gradual routine changes, only occasional interaction with co-workers and supervisors, and no public contact. (*Id*.) Because of Ms. Washington's episodes of anger, disruptive behavior, and auditory hallucinations, the ALJ found that she was unable to maintain attention and concentration for at least 20 % of the workday. (*Id*.)

The ALJ gave some weight to the findings of Dr. Shertock because Dr. Shertock had personally observed and examined Ms. Washington during the consultative psychological evaluation, and because Dr. Shertock had included in her consideration Ms. Washington's "polysubstance dependence." (AR 24.) The ALJ reviewed the results of Dr. Shertock's testing and noted Ms. Washington's statements to Dr. Shertock that she smoked marijuana and drank "as much as she can" to ease the pain. (AR 23-24.) The ALJ referenced Dr. Shertock's statement that it was unclear to what extent Ms. Washington's past or current psychiatric symptoms were exacerbated by her substance use. (AR 24.) The ALJ also found Dr. Shertock's findings to be consistent with the objective medical evidence in the record. (*Id*.) The ALJ therefore gave some weight to Dr. Shertock's opinion that Ms. Washington had moderate impairments with complex tasks, attention, and concentration and a marked impairment in the ability to adapt to changes in routine work-related settings. (*Id*.) Based on these findings, the ALJ found it appropriate to include a limitation of simple tasks and gradual routine changes.

The ALJ gave little weight to the opinions of Dr. Tobias, Dr. Wiebe, Dr. Boroff, and the state agency mental medical consultants because she found that they did not adequately consider Ms. Washington's polysubstance use in assessing her functional limitations. (*Id*.) The ALJ found that when she viewed the evidence as a whole, Ms. Washington was "more limited than determined by the State agency mental medical consultants" due to her hallucinations, behavioral issues, and substance use. (*Id*.)

In determining Ms. Washington's physical residual capacity limitations, the ALJ gave significant weight to the opinion of Dr. Lewis because Dr. Lewis had personally observed and examined Ms. Washington and because the medical record showed infrequent and limited treatment for the medical issues Ms. Washington alleged at the hearing. (AR 25.) Based on the

1  lack of treatment evidence in the record, the ALJ gave little weight to the opinions of Dr. Chen

2  and the state agency physical medical consultants who had limited Ms. Washington to physical

3  residual functional capacity at less than the light exertional level. (*Id.*)

4      Based on the testimony of the vocational expert, the ALJ found that Ms. Washington was not

5  able to perform any past relevant work. (*Id.*) She made this finding after considering Ms.

6  Washington's abilities both with substance use and if Ms. Washington's substance use stopped.

7  (AR 26.)

8      The ALJ found that all of Ms. Washington's impairments, including her substance use disorder

9  impeded her ability to perform all or substantially all of the requirements of medium work. (AR

10 26-27.) The ALJ thus found that considering Ms. Washington's age, education, work experience,

11 and residual functional capacities based on all of her impairments, including her substance use

12 disorders, there were no jobs that existed in significant numbers in the economy that Ms.

13 Washington could perform and that she would therefore be "disabled." (*Id.*)

14     The ALJ did not conclude her analysis there. Instead, the ALJ then conducted a full analysis of

15 Ms. Washington's disability status if she were to stop her substance use. (AR 27-38.)

16     The ALJ first found that if Ms. Washington were to stop her substance use, her remaining

17 limitations would cause more than a minimal impact in her ability to perform basic work activities

18 so that she would still continue to have a severe impairment or combination of impairments. (AR

19 27.) The ALJ next determined that if Ms. Washington were to stop her substance use, she would

20 not have an impairment or combination of impairments that met or equaled any of the impairments

21 listed in 20 CFR Part 404. (*Id.*) In so finding, she relied on her original analysis of the paragraph B

22 and paragraph C criteria. (*Id.*)

23     The ALJ then discussed Ms. Washington's residual functional capacity were she to stop her

24 substance use. (AR 28.) The ALJ found that without substance use, Ms. Washington would have

25 the residual functional capacity to do the following: lift and carry 50 pounds occasionally and 25

26 pounds frequently; sit without limitations; stand and walk for four hours; frequently climb ramps

27 and stairs; frequently balance, stoop, kneel, crouch and crawl; reach overhead occasionally with

28 the left upper extremity but otherwise reach frequently in all other directions; frequently feel,

United States District Court
Northern District of California

United States District Court
Northern District of California

1  finger, and handle with the left upper extremity with no such limitations on the right upper

2  extremity; no work at heights, or around heavy machinery, or extreme temperatures; no

3  concentrated exposure to dust, fumes, odors, or gases; limited to simple, routine work; maintain

4  attention, concentration, persistence, and pace for two-hour increments; can adapt to routine

5  changes if the changes are introduced gradually; and occasional interaction with co-workers and

6  supervisors but no public contact. (*Id.*) The only change the ALJ made therefore was to remove

7  the limitation that Ms. Washington could not maintain attention and concentration for at least 20%

8  of the workday. (*Id.*)

9      In making this finding, the ALJ first reviewed Ms. Washington's recent work history as a

10  certified nursing assistant. (AR 29.) The ALJ noted the discrepancy in Ms. Washington's

11  testimony about her highest level of education. (*Id.*) The ALJ then summarized Ms. Washington's

12  testimony from the hearing about her various medical conditions, including her depression,

13  anxiety, paranoia, left arm and side pain, asthma, bronchitis, Hepatitis C, and HIV. (*Id.*) The ALJ

14  noted Ms. Washington's hearing testimony that she had stopped drinking alcohol in 2001 and Ms.

15  Washington's acknowledged use of marijuana, including use two days before the hearing. (*Id.*)

16      The ALJ discussed Ms. Washington's testimony about her mental state, including her assertion

17  that she heard voices all the time and that she had bad dreams. (*Id.*) The ALJ noted that Ms.

18  Washington saw Dr. Michael Boroff for treatment of her mental health issues. (*Id.*)

19      As to Ms. Washington's living situation and activities of daily life, the ALJ reviewed Ms.

20  Washington's testimony that she lived primarily with her niece and that while her niece performed

21  most of the household chores, Ms. Washington babysat and cooked for her niece at times. (*Id.*)

22      Based on all of the above, the ALJ concluded that Ms. Washington's testimony about the

23  intensity, persistence, and limiting effects of her symptoms was not fully credible. (*Id.*) The ALJ

24  specifically found that Ms. Washington's allegations about the debilitating effect of her physical

25  and mental limitations were not consistent with the objective medical evidence. (AR 29-30.)

26      In so finding, the ALJ considered the evidence from Dr. Tobias that Ms. Washington had put

27  decreased effort into the testing and that Ms. Washington was engaging in "possible malingering

28  or misrepresentation." (AR 30.) The ALJ also found that at the hearing that Ms. Washington

attempted to minimize her daily activities. (*Id*.) The ALJ found that the record supported that Ms. Washington was able to prepare simple meals, do light household chores and shopping, take public transportation, and occasionally attend religious services. (*Id*.) Additionally, the medical evidence indicated that Ms. Washington received infrequent, conservative, and generally limited medical treatment. (*Id*.) The ALJ found that the minimal amount of medical treatment called Ms. Washington's testimony about the severity of her symptoms further into question. (*Id*.)

The ALJ found that while Ms. Washington alleged that her depression, anxiety, and paranoia kept her from working, Ms. Washington had not received "the type of mental health treatment one would expect for a totally disabled individual." (*Id*.) The ALJ stated that there was no medical evidence to support Ms. Washington's assertion that she took daily anxiety medication. (*Id*.) The ALJ stated that the lack of medical evidence of mental health treatment diminished the credibility of Ms. Washington's allegation of the severity of those conditions. (AR 30-31.)

The ALJ then reviewed Ms. Washington's medical impairments and summarized the medical evidence in the record. (AR 31-37.) The ALJ found again found that Ms. Washington's physical impairments could reasonably be expected to produce the alleged symptoms, but that Ms. Washington's statements about the intensity, persistence, and limiting effect were not credible to the extent that her testimony was inconsistent with the residual functional analysis. (AR 31.)

As for Ms. Washington's medical impairments, the ALJ noted that Ms. Washington was uncooperative at her medical appointments in December 2012 and February 2013. (AR 32.) The ALJ again gave significant weight to the opinions of Dr. Lewis and little weight to the opinions of Dr. Chen as it related to Ms. Washington's physical limitations. (AR 33-34.)

In determining Ms. Washington's mental residual functional capacity without substance use, the ALJ gave "significant weight, but not full weight" to the opinions of Dr. Tobias, Dr. Shertock, and the state agency medical mental consultants. (AR 35.) The ALJ noted that while Dr. Tobias had administered tests to Ms. Washington, Dr. Tobias considered the results of the tests invalid due to Ms. Washington's decreased motivation and effort. (AR 34.) Dr. Tobias opined that Ms. Washington had only a mild impairment on her ability to withstand the stress of a routine workday, maintain emotional stability/predictability, and interact appropriately with coworkers,

United States District Court
Northern District of California

supervisors, and the public on a regular basis. (*Id.*) Dr. Shertock diagnosed Ms. Washington with moderate impairments in her ability to understand, remember, and carry out complex instructions, maintain attention and concentration for the duration of the evaluation, maintain adequate pace while completing tasks, and withstand the stress of an eight-hour day. (AR 35.) Dr. Shertock stated that Ms. Washington had a marked impairment in her ability to adapt to changes in routine work-related settings. (*Id.*) The state agency medical consultants stated that Ms. Washington had moderate difficulties in maintaining social functioning. (*Id.*) They also opined that Ms. Washington had moderate difficulties in maintaining concentration, persistence, and pace but that she could do so for simple tasks on a sustained basis with limited public contact. (*Id.*)

Again, the ALJ discounted Ms. Washington's allegations of the severity of her mental symptoms based on the paucity of medical treatment and the fact that Ms. Washington showed resistant or aggressive behavior toward mental health treatment providers. (*Id.*) The ALJ found that in light of Ms. Washington's allegations, behavior, and the medical record, a moderate limitation of simple and routine work, gradual routine changes, occasional interaction with coworkers and supervisors, and no public contact was warranted. (*Id.*)

The ALJ gave little weight to the opinion of consultative psychological evaluator Dr. Wiebe. (AR 37.) Dr. Wiebe found that Ms. Washington had extreme limitations in all mental abilities and aptitudes needed to do unskilled work. (AR 36.) The ALJ noted that Dr. Wiebe was not a treatment provider but had been hired by Ms. Washington's counsel and had been paid for her opinion. (AR 35.) The ALJ acknowledged that paid opinions were legitimate and deserved due consideration, but stated that the context in which the report was produced could not be ignored. (*Id.*) Other factors that the ALJ took into consideration in determining the weight to give Dr. Wiebe's opinion included (1) the evaluation was limited in scope and based only on one session of contact and (2) Dr. Wiebe had no medical records available for review. (AR 36.)

The ALJ also gave little weight to the opinion of Dr. Boroff. (AR 37.) Dr. Boroff met with Ms. Washington for a total of three times in December 2013 and January 2014 to conduct mental status evaluations. (AR 36-37.) Dr. Boroff reported that Ms. Washington continued with psychological counseling in March and April of 2014. (AR 37.) In January 2014, Dr. Boroff found

1    that Ms. Washington had extreme impairments in all work-related abilities except adhering to

2    basic standards of neatness and cleanliness. (*Id*.)

3        The ALJ gave little weight to the opinions of Dr. Wiebe and Dr. Boroff because she found that

4    there was "no longitudinal mental health treatment history with adequate positive objective

5    findings to support [the] extreme limitations" they found. (*Id*.) The ALJ also again noted that Ms.

6    Washington had received mental health treatment only for brief periods in December 2012,

7    February 2013, and December 2013 through April 2014. (*Id*.) The ALJ also discounted the

8    opinions of these doctors because they gave little consideration to the effects of Ms. Washington's

9    admitted substance use on her ability to function. (*Id*.) Finally, the ALJ found that the opinions of

10   Dr. Wiebe and Dr. Boroff were not supported by the other objective medical evidence in the

11   record. (*Id*.) The ALJ found that the residual functional capacity assessment she had made was

12   supported by the record as a whole.

13       The ALJ found that even if Ms. Washington were to stop her substance use, she would not be

14   able to return to her past relevant work. (*Id*.) Based on the testimony of the vocational expert at the

15   hearing, the ALJ found that Ms. Washington could perform the duties of a warehouse worker, an

16   industrial cleaner, or an equipment tester. (AR 38.)

17       The ALJ also specifically found that Ms. Washington's substance use disorder was a

18   "contributing factor material to the determination of disability because [Ms. Washington] would

19   not be disabled if she stopped the substance use." (*Id*.) The ALJ concluded that Ms. Washington

20   had not been disabled within the meaning of the Social Security Act at any time from the alleged

21   onset date though the date of the decision. (*Id*.)

22                                          **ANALYSIS**

23   **1. Standard of Review**

24       Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

25   commissioner if the claimant initiates the suit within sixty days of the decision. District courts

26   may set aside the commissioner's denial of benefits only if the ALJ's "findings are based on legal

27   error or are not supported by substantial evidence in the record as a whole." 42 U.S.C. § 405(g);

28   *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence

United States District Court
Northern District of California

means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrew v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If the evidence in the administrative record supports both the ALJ's decision and a different outcome, the court must defer to the ALJ's decision and may not substitute its own decision. *See id.*; *Tackett v. Apfel*, 180 F.3d 1094, 1097–98 (9th Cir. 1999).

## 2. Applicable Law

An SSDI claimant is considered disabled if (1) he suffers from a "medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months," and (2) the "impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A) & (B). There is a five-step analysis for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

> **Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

> **Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

> **Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

> **Step Four.** Considering the claimant's RFC, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

> **Step Five.** Considering the claimant's RFC, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do.

United States District Court
Northern District of California

> There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the commissioner.

### 3. Discussion

The ALJ first considered Ms. Washington's residual functional capacity taking into account all of her impairments, including her substance-use disorders. (AR 26.) The ALJ found that considering all of Ms. Washington's impairments, there were no jobs in significant numbers that Ms. Washington could perform. (*Id.*) Ms. Washington would therefore be disabled. When the ALJ considered Ms. Washington's residual functional capacity if she were to stop the substance use, however, the ALJ found that Ms. Washington had the residual functional capacity to perform a significant number of jobs in the national economy. (AR 37.) As noted above, the only difference in the two residual functional capacity analyses found by the ALJ is that when Ms. Washington's polysubstance abuse was taken into consideration, the ALJ found that Ms. Washington could not maintain attention and concentration for at least 20% of the workday. (*Id.*) The ALJ removed that restriction when considering Ms. Washington's residual functional capacity without polysubstance use, and without that limitation found that there were significant positions in the national economy that Ms. Washington could perform. (*Id.*)

As part of the residual functional capacity analysis without substance use, the ALJ assigned the following mental capacity limitations to Ms. Washington: she was limited to simple, routine work; she could maintain attention, concentration, persistence, and pace for two-hour increments; she could adapt to routine changes if the changes were introduced gradually; and she could have occasional interaction with coworkers and supervisors but no public contact. (AR 28.)

Ms. Washington asserts that the ALJ erred as follows: (1) in her determination of the materiality of Ms. Washington's substance use; (2) in her evaluation of the medical evidence; (3) in her determination of Ms. Washington's limitations; and (4) in fashioning her hypothetical to the vocational expert and in relying on his testimony about job erosion. (MSJ, ECF No.16.)

### 3.1 The ALJ Failed to Properly Determine the Effects of Ms. Washington's Substance Use.

The ALJ made two separate RFC determinations. The ALJ found that Ms. Washington would be disabled if her polysubstance use were taken into account, but also found that if she abstained from substance use, she could perform positions available in substantial numbers in the economy.

Ms. Washington argues that the ALJ did not apply the appropriate analysis for a case that involves drug or alcohol addiction. (MSJ, ECF No. 16 at 23-24.) If the ALJ had applied the correct analysis, Ms. Washington asserts that the evidence would have shown that Ms. Washington's disabilities were not a function of her substance use and therefore would not improve to the point of nondisability if she stopped her substance use. (*Id*. at 23.)

In cases where the record indicates the claimant suffers from a drug or alcohol addiction, "the ALJ must conduct a drug and alcoholism analysis by determining which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol." *Parra v. Astrue*, 481 F.3d 742, 747 (9th Cir. 2001); *see also* 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2); *Ball v. Massanari*, 254 F.3d 817, 821 (9th Cir. 2001). If a claimant is found to be disabled and there is medical evidence of drug addiction or alcoholism, the Commissioner must then determine whether that substance abuse is a contributing factor material to the finding of disability. 20 C.F.R. §404.1535(a). Essentially, drug addiction or alcoholism is a "contributing factor" under the statute if the claimant's disability ceases when she stops using drugs or alcohol. *Id*. § 404.1535(b).

The Ninth Circuit has stressed that courts must not "fail to distinguish between substance abuse contributing to the disability and the disability remaining after the claimant stopped using drugs or alcohol." *See Kroeger v. Calvin*, 2015 WL 2398398 (N.D. Cal. May 19, 2015) at *10 quoting *Sousa v. Callahan*, 143 F.3d 1240, 1245 (9th Cir. 1998)). That is, "[j]ust because substance abuse contributes to a disability does not mean that when the substance abuse ends, the disability will too." (*Id.*)

A diagnosis of drug addiction or alcoholism must be supported by objective medical evidence from an acceptable medical source. SSR 13-2p(8)(b)(i). The burden rests on the claimant to prove that drug or alcohol use is not a contributing factor material to her disability. *Parra*, 481 F.3d at

748.

The only treating or examining doctor to diagnose Ms. Washington with substance abuse is Dr. Shertock. (AR 512.) Dr. Shertock's diagnosis apparently was based on Ms. Washington's self-report that she used to smoke marijuana and that she drinks as much as she can to ease the pain. First, self-reported drug or alcohol use does not in itself establish the existence of a medically determinable substance use disorder. SSR 13-2p(8)(b)(i)-(ii). Second, the ALJ found Ms. Washington's testimony generally not to be credible. (AR 29.) Ms. Washington's self-reported drug and alcohol use throughout the record has many inconsistencies in it, and Ms. Washington was noted by several examiners and treaters to be a poor historian. Moreover, while Ms. Washington appeared for treatment numerous times at the San Leandro Hospital emergency room there was never a diagnosis in her record that she suffered from drug or alcohol dependence.

Even if the court were to accept Dr. Shertock's diagnosis of substance abuse as supported by the record, it is inconclusive as to how the ALJ's residual functional capacity assessment should be affected by the finding because Dr. Shertock stated that it was unclear to what extent Ms. Washington's past or present symptoms were due to or were exacerbated by her substance use. (AR 512.)

In contrast, Ms. Washington presented evidence from Dr. Boroff that her impairments were completely unrelated to substance abuse. (AR 559.) While the ALJ discounted Dr. Boroff's opinion, as discussed below, it was error for her to have done so. Finally, even if the ALJ had been correct in finding Ms. Washington's substance use material, the ALJ failed to correlate the change in her RFC determinations (Ms. Washington's being off task 20% of the day with substance use and her determination that Ms. Washington could maintain focus in two-hour increments if she stopped drug use) with any objective findings in the record. An ALJ's finding of limitations in an RFC are to be upheld if they are supported by "substantial evidence." 42 U.S.C. § 405(g); *Vasquez v. Astrue,* 572 F.3d 586,591(9th Cir. 2009) (quotation omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Andrews v. Shalala,* 53 F.3d 1035, 1039. (9th Cir. 1995). Because the ALJ did not cite to substantial evidence in the record supporting her

1    RFC analysis for Ms. Washington's abilities if she stopped the substance use, the court cannot

2    uphold her findings.

3        **3.2 The ALJ Erred in Her Determination of The Weight She Accorded to the Physicians'**

4            **Opinions.**

5        Ms. Washington argues that the ALJ erred in the weights she assigned to the opinions of Dr.

6    Boroff, Dr. Wiebe, Dr. Shertock, Dr. Tobias, and the state agency medical mental consultant.

7    (MSJ, ECF No. 16 at 4–14.) In making her residual functional capacity determination, the ALJ

8    accorded significant weight to the opinions of Dr. Shertock, Dr. Tobias, and the state agency

9    medical mental consultant. (AR 35.) The ALJ accorded little weight to the opinions of treatment

10   provider Dr. Boroff and consultative evaluator Dr. Wiebe. (AR 35-37.)

11       **3.2.1   Dr. Boroff and Dr. Wiebe**

12       Ms. Washington asserts that the ALJ erred by giving little weight to the opinions of her

13   treatment provider Dr. Boroff and to the psychological evaluator Dr. Wiebe without providing

14   specific, legitimate reasons supported by substantial evidence. (MSJ, ECF No. 16 at 5-9.)

15       Dr. Boroff assessed Ms. Washington with extreme limitations in each category of work-related

16   mental abilities, except he found that she had only a marked limitation in her ability to adhere to

17   basic standards of neatness and cleanliness. (AR 561.) Dr. Boroff noted that Ms. Washington had

18   extreme restrictions in the following areas: the activities of daily living; maintaining social

19   functioning; and maintaining concentration, persistence or pace. (AR 562.) Dr. Wiebe found that

20   Ms. Washington had extreme limitations in all mental abilities and aptitudes needed to do

21   unskilled work. (AR 36.)

22       The ALJ considered Dr. Boroff and Dr. Wiebe's findings but gave their opinions "little

23   weight," stating that Ms. Washington had "no longitudinal mental health treatment history with

24   adequate positive objective findings to support extreme limitations opined by Drs. Wiebe and

25   Boroff." (AR 37.) The ALJ stated that she also gave these opinions little weight because Ms.

26   Washington's mental-health treatment was "short-lived, lasting only brief periods in December

27   2012 and February 2013, and again for limited appointments from approximately December 2013

28   to April 2014." (*Id.*) (record citations omitted.) As an additional reason, the ALJ found that Drs.

United States District Court
Northern District of California

1   Wiebe and Boroff gave "little consideration" to Ms. Washington's admitted history of

2   polysubstance abuse on her limitations and functioning. (*Id.*)

3        Ms. Washington argues that the ALJ erred by giving treating physician Dr. Boroff's opinion

4   little weight as he was the most recent and longitudinal treatment provider and he also had

5   reviewed Ms. Washington's treatment record. (*Id.* at 6.) In determining whether a claimant is

6   disabled, the ALJ must consider each medical opinion in the record, together with the rest of the

7   relevant evidence. 20 C.F.R. § 416.927(b); *Zamora v. Astrue*, No. C 09-3273 JF, 2010 WL

8   3814179, at *3 (N.D. Cal. Sept. 27, 2010). "By rule, the Social Security Administration favors the

9   opinion of a treating physician over non-treating physicians." *Orn v. Astrue*, 495 F.3d 625, 631

10  (9th Cir. 2007) (citing 20 C.F.R. § 404.1527). "The opinion of a treating physician is given

11  deference because 'he is employed to cure and has a greater opportunity to know and observe the

12  patient as an individual.'" *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir.

13  1999) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)). "However, the opinion of

14  the treating physician is not necessarily conclusive as to either the physical condition or the

15  ultimate issue of disability." *Id.* (citing *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989)

16  and *Rodriguez v. Bowen*, 876 F.2d 759, 761-62 & n.7 (9th Cir. 1989)). "If a treating physician's

17  opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques

18  and is not inconsistent with the other substantial evidence in [the] case record, [it will be given]

19  controlling weight.'" *Orn*, 495 F.3d at 631 (quoting 20 C.F.R. § 404.1527(d)(2)).

20       "If a treating physician's opinion is not given 'controlling weight' because it is not 'well-

21  supported' or because it is inconsistent with other substantial evidence in the record, the [Social

22  Security] Administration considers specified factors in determining the weight it will be given."

23  *Id.* "Those factors include the '[l]ength of the treatment relationship and the frequency of

24  examination' by the treating physician; and the 'nature and extent of the treatment relationship'

25  between the patient and the treating physician." *Id.* (citing 20 C.F.R. § 404.1527(b)(2)(i)-(ii)).

26  "Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the

27  treating physician, include the amount of relevant evidence that supports the opinion and the

28  quality of the explanation provided; the consistency of the medical opinion with the record as a

United States District Court
Northern District of California

whole; the specialty of the physician providing the opinion; and '[o]ther factors' such as the degree of understanding a physician has of the [Social Security] Administration's 'disability programs and their evidentiary requirements' and the degree of his or her familiarity with other information in the case record." *Id*. (citing 20 C.F.R. § 404.1527(d)(3)-(6)). Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it still is entitled to deference. *See id*. at 632 (citing SSR 96-02p at 4 (Cum. Ed. 1996)). Indeed, "[i]n many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-02p at 4 (Cum. Ed. 1996).

The ALJ first found that there was insufficient "longitude" to the treatment. The ALJ took testimony from Ms. Washington at a hearing in February 2014, and wrote her opinion in May 2014. (AR 14, 39.) Dr. Boroff met with Ms. Washington on three occasions in the December 2013-January 2014 time frame, and then met with her again after the hearing but before the ALJ had written her decision. (AR 556.) Dr. Boroff's notes from the subsequent meetings were made a part of the administrative record. (AR 569-70.) While this is not an overly lengthy period of time, it is the longest continuous period of mental health treatment in the record. Moreover, while the ALJ could have appropriately discounted Dr. Boroff's opinion on the basis of brevity of treatment, she gave the significant weight to the two doctors who examined Ms. Washington once each and to the State Agency Medical Consultants who neither treated nor examined Ms. Washington; this undercuts her rationale rejecting Dr. Boroff's opinion. Moreover, Dr. Boroff's opinion, while not based on a lengthy period of treatment, was based on his clinical observations and clinical assessment, which are objective findings of Ms. Washington's mental status and therefore should have been awarded a greater amount of deference.

To the extent the ALJ's stated concern was Ms. Washington's erratic mental health treatment record, the Ninth Circuit has called it "a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)). The record demonstrates that Ms. Washington's mental health problems have impeded her ability to maintain relationships with mental health providers. (*See e.g.* AR 471, 482, 484.)

The ALJ also cited as a reason for giving Dr. Boroff's opinion little weight his alleged lack of consideration of the effects of polysubstance abuse on Ms. Washington's impairment. (AR 37.) Dr. Boroff was clearly aware of Ms. Washington's history of substance use both because he reviewed the records that discussed substance abuse and because he stated that "[Ms. Washington's] impairments are completely unrelated to substance abuse." (AR 559.)

The ALJ also gave little weight to Dr. Wiebe's opinion for the same reasons that she gave little weight to Dr. Boroff's opinion. (AR 37.) The ALJ gave Dr. Wiebe's opinion less weight for her alleged failure to consider addition consider substance abuse, but Dr. Wiebe discussed Ms. Washington's history of substance use and noted the possibility that Ms. Washington was self-medicating. (AR 534.) Nonetheless, Dr. Wiebe found that the "[p]roblems [Ms. Washington] manifested were congruent with psychiatric and cognitive functioning problems known to result from being victimized and threatened in an abusive relationship, compounding symptoms of distrustfulness; ineffective help-seeking; and interactional difficulties." (AR 542.) While Dr. Wiebe met with Ms. Washington just once, her diagnoses are consistent with Dr. Boroff's. The ALJ also discounted Dr. Wiebe's opinion in part because Ms. Washington was referred to Dr. Wiebe for an evaluation by her attorney, stating, "[i]t is emphasized that [Ms. Washington] underwent the examination by Dr. Wiebe not in an attempt to seek treatment for symptoms, but rather through an attorney referral in an effort to generate evidence for the hearing. Further, Dr. Wiebe was presumably paid for the report. Although such evidence is certainly legitimate and deserves due consideration, the context in which it is produced cannot be entirely ignored." (AR 35.) In *Reddick v. Chater*, the Ninth Circuit held that "in the absence of other evidence to undermine the credibility of a medical report, the purpose for which the report was obtained does not provide a legitimate basis for rejecting it." 157 F.3d 715, 726 (9th Cir. 1998).

Dr. Wiebe's report is based on objective testing and three hours of observation of Ms. Washington. The report has a comprehensive summary of her conclusions and the test results that support those conclusions (AR 528.) Moreover, her opinions are consistent with Dr. Boroff's. For these reasons, it was error for the ALJ to give Dr. Wiebe's report less weight based on Dr. Wiebe's perceived bias as a consultant.

### 3.2.1 The ALJ Erred by Assigning Significant Weight to the Opinions of Dr. Tobias and Dr. Shertock.

By contrast to the weight that she gave the opinions of Dr. Boroff and Wiebe, the ALJ gave significant weight to the opinions of consultative examiners Dr. Tobias and Dr. Shertock. Dr. Tobias met once with Ms. Washington in March 2011. Dr. Tobias diagnosed Ms. Washington with a depressed mood but stated that Ms. Washington's self-reported psychiatric symptoms should be considered with caution. From a mental ability perspective, Dr. Tobias found Ms. Washington generally able to perform most work related tasks with little or no limitation. Dr. Tobias also diagnosed Ms. Washington with malingering. (AR 385.)

The ALJ assigned "significant" weight to Dr. Tobias' opinion generally, finding that it was consistent with the record as a whole. (AR 34-35). Where the opinion of a nontreating source is based on independent clinical findings that differ from those of a treating physician, the opinion of the nontreating source may itself be substantial evidence, and it is then solely the province of the ALJ to resolve the conflict. *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995). Here however, there are a number of bases in the record to accord less weight to Dr. Tobias's opinion. First, Dr. Tobias herself found that the results of the tests she administered to Ms. Washington invalid due to Ms. Washington's decreased effort on the tests. (AR 385.) Second, Dr. Tobias's diagnosis of depressed mood was inconsistent with each of the other treatment providers and examiners, all of whom diagnosed Ms. Washington with PTSD and major depressive disorder. (AR 501-13, 528-45, 556-68, 569.)

Dr. Tobias's assessment was also inconsistent with the rest of the record to the extent that she diagnosed Ms. Washington with malingering. Not only did no other treatment provider diagnose Ms. Washington with malingering, but also, Dr. Wiebe specifically addressed the malingering diagnosis by Dr. Tobias and opined that the behaviors which Dr. Tobias referenced as evidence of malingering were evidence consistent with persons who, like Ms. Washington, had experienced trauma. (AR 542.)

The ALJ also gave significant weight to the opinion of Dr. Shertock. (AR 24, 35.) It is not sufficient to merely say an opinion is consistent with the record as a whole. The ALJ must give

reasons supported by the evidence. As discussed above, Dr. Shertock's opinion was inconsistent with the rest of the medical record to the extent that Dr. Shertock considered Ms. Washington's impairments related to polysubstance abuse. (AR 25.) Not only is Dr. Shertock's opinion inconsistent with the record, it is based on meeting with Ms. Washington for a briefer period of time than her meetings with Dr. Boroff and Dr. Wiebe. (AR 37.) Moreover, not only is Dr. Shertock the only examiner to diagnose polysubstance dependence, but also, she stated that it was unclear to what extent the Ms. Washington's past or present psychiatric symptoms may be due to, or exacerbated by, her substance use. (AR 512.)

For the above mentioned reasons, no reasons cited by the ALJ rise to the level of specific and legitimate reasons supported by substantial evidence, and thus, the ALJ erred by assigning weight to Dr. Shertock.

To the extent that Dr. Shertock's diagnosis of substance abuse was inconsistent with the record, but the ALJ wished to rely upon it, the ALJ had a duty and an ability to seek further information. *See Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003). "If the ALJ thought he needed to know the basis of [a doctor's] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them." *Smole v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996); *see also McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (as amended). In fact, in this case, at the first hearing, the ALJ requested the input of a medical expert but for reasons not made clear in the record did not have the services of a medical expert available at the second hearing. (AR 47, 71, 212-15.) It was therefore error for the ALJ to give substantial weight to the opinions of Dr. Tobias and Shertock over the opinions of Drs. Boroff and Wiebe.

### 3.2.2   The ALJ Erred in Assigning Significant Weight to the Opinion of the State Agency Mental Medical Consultant.

The ALJ gave significant weight to the opinion from state agency medical consultant Dr. Hilary Weiss. (AR 35, 115-17.) Based on her review of the records in May 2013, Dr. Weiss noted that Ms. Washington had a mental impairment and that she was currently alcohol dependent. Dr. Weiss concluded that Ms. Washington was capable of concentration, persistence, and pace for

1   simple tasks with limited public contact. (AR 110, 115-17.) Again, as noted above, the ALJ's

2   decision is internally inconsistent. The ALJ relied on Dr. Weiss's opinion to determine that Ms.

3   Washington had only moderate restrictions in activities of daily living, social interaction, and

4   concentration, persistence, and pace. (AR 20.) The opinions of non-examining medical consultants

5   can be given weight only insofar as they are supported by evidence in the case record, are

6   consistent with the record as a whole, and are explained. SSR 96-6p; 20 C.F.R. § 416.927, SSR

7   96-7p.

8       Ms. Washington argues that the ALJ should have given less weight to Dr. Weiss's opinion

9   because it pre-dated, and therefore did not include, the psychological report of Dr. Wiebe, an

10  examining source, or the treatment notes, treatment summary, or the Mental Impairment

11  Questionnaire completed by Dr. Boroff, a treating source, all of which were in the record. (MSJ,

12  ECF No. 16 at 13.) Ms. Washington again notes that the ALJ had the opportunity to have a

13  medical expert available at the hearing to address such conflicts in the record, but chose not to

14  avail herself of that option. (*Id.*)

15      Because the opinions of Dr. Wiebe and Boroff were entitled to greater weight and were

16  inconsistent with the medical consultant's findings, and because the ALJ did not take steps to

17  address the inconsistencies, it was error for the ALJ to have accorded significant weight to the

18  opinion of Dr. Weiss.

19      **3.3. The ALJ's Step Three Determination Was Not Based on Substantial Evidence**.

20      The ALJ must determine whether a claimant's condition meets or equals a listing. 20 C.F.R.

21  § 404.1520; 20 C.F.R. § 404.1525; 20 C.F.R. § 404.1526. The ALJ's decision must be supported

22  by substantial evidence. *McCartey v. Massanari*, 298 F.3d 1072, 1075 (9th Cir. 2002).

23  Additionally, the "ALJ must evaluate the relevant evidence before concluding that a Ms.

24  Washington's impairments do not meet or equal a listed impairment. A boilerplate finding is

25  insufficient to support a conclusion that Ms. Washington's impairment does not" meet a listing.

26  *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) (citing *Marcia v. Sullivan*, 900 F.2d 172, 176

27  (9th Cir. 1990)). The ALJ determined that Ms. Washington did not satisfy the "B" criteria. (AR

28  19.) Ms. Washington argues that had the ALJ properly credited Dr. Boroff and Dr. Wiebe's

United States District Court
Northern District of California

1   opinions, she would not have found that Ms. Washington had only a moderate limitation on the

2   activities of daily living, on social functioning, and on concentration, persistence, and pace.

3        Both Dr. Boroff and Dr. Wiebe opined that Ms. Washington had either severe or extreme

4   limitations in activities of daily living. (AR 542, 562.) Furthermore, Dr. Boroff concluded that Ms.

5   Washington was unable to attend any job with regularity. (AR 557, 558.)

6        In addition to relying on the state agency opinion that Ms. Washington had only moderate

7   restrictions on the activities of daily living, the ALJ also based her opinion on Ms. Washington's

8   assertion that "she babysits and cooks for her niece at times" and that "she is able to handle few

9   responsibilities of daily living." (AR 20.) But Ms. Washington testified at the hearing that while

10   she babysat for her niece a couple of times, on one occasion Ms. Washington was so scared she

11   hid in the closet, leaving the children unattended, until her niece returned. (AR 50.)

12        The ALJ also relied on information about Ms. Washington's abilities during 2011 and 2013,

13   which pre-dated the assessments by Dr. Wiebe and Dr. Boroff. (AR 50, 512.) Furthermore, the

14   Ninth Circuit "has repeatedly asserted that the mere fact that a plaintiff has carried on certain daily

15   activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any

16   way detract from her credibility as to her overall disability. One does not need to be 'utterly

17   incapacitated' in order to be disabled." *Vertigan v Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001)

18   (quoting *Fair v Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)); *Cooper v Bowen*, 815 F.2d 557, 561

19   (9th Cir. 1987). The Ninth Circuit has "recognized that disability claimant should not be penalized

20   for attempting to lead normal lives in the face of their limitations." *Reddick*, 157 F.3d at 720. The

21   ALJ should not have required Ms. Washington to be 'utterly incapacitated' in order to find a more

22   severe impairment in activities of daily living.

23        As it relates to her social functioning, Dr. Wiebe noted that due to her personality disorder

24   problems, Ms. Washington avoids relationships and has difficulty interacting with others. She is

25   anxious, angry, and lacks social skills. (AR 532.) Dr. Boroff opined that Ms. Washington would

26   be unable to exhibit socially appropriate behavior and would be likely to be volatile if placed in a

27   working environment. (AR 558.) Dr. Shertock, whose opinion the ALJ gave weight, also noted

28   that "Ms. Washington was unable to interact appropriately with the examiner and based upon her

United States District Court
Northern District of California

1    reported history, her ability to interact with the public, supervisors, and coworkers appears

2    questionable." (AR 513.) The record also reflected other situations where Ms. Washington became

3    agitated, anxious, and uncooperative with treatment providers or examiners. (*See e.g.* AR 471,

4    482, 484.) The ALJ's assertion therefore that Ms. Washington has only a moderate limitation in

5    social functioning is not supported by substantial evidence, and as such is error.

6        Finally, the ALJ determined that Ms. Washington had only moderate limitations on

7    concentration, persistence, and pace. Again, Dr. Wiebe and Dr. Boroff's findings were to the

8    contrary. Dr. Wiebe notes that Ms. Washington's functioning regarding concentration, attention,

9    and persistence is severely impaired. (AR 536-537.) Dr. Boroff found that Ms. Washington would

10   be unable to focus on job tasks and would require excessive supervision. (AR 558.) Dr. Boroff

11   further found that Ms. Washington had an extreme limitation in her ability to remember and carry

12   out simple instructions and an extreme limitation in concentration, persistence, and pace. (AR

13   562.) The ALJ's assertion that Ms. Washington has only a moderate limitation in concentration,

14   persistence, and pace therefore is not supported by substantial evidence.

15       **3.4 The ALJ's Hypothetical to the Vocational Expert Was Incomplete**

16       Ms. Washington makes two arguments related to the testimony of the vocational expert. First,

17   she argues that had the ALJ properly credited Dr. Boroff and Dr. Wiebe's opinions, the

18   hypothetical questions posed by the ALJ would have included all of Ms. Washington's limitations.

19   The ALJ may meet her burden under step five by propounding to a vocational expert a

20   hypothetical that is based on medical assumptions supported by substantial evidence in the record

21   and that reflects all the claimant's limitations. *See Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir.

22   1995); *Magallanes*, 881 F.2d at 756; *see also Valentine*, 574 F.3d at 690 (a hypothetical that fails

23   to take into account a claimant's limitations is defective).

24       The ALJ's depiction of the claimant's impairments must be "accurate, detailed, and supported

25   by the medical record." *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999). "A hypothetical

26   question posed to a vocational expert must 'include all of the claimant's functional limitations,

27   both physical and mental.'" *Brink v. Commissioner Social Sec. Admin.*, 343 Fed.Appx. 211, 212

28   (9th Cir. 2009) (quoting *Flores v. Shalala*, 49 F.3d 562, 570 (9th Cir. 1995).). "If a vocational

1   expert's hypothetical does not reflect all the claimant's limitations, then the expert's testimony has

2   no evidentiary value to support a finding that the claimant can perform jobs in the national

3   economy." *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting *Matthews v. Shalala*, 10

4   F.3d 678, 681 (9th Cir. 1993)); *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

5        Ms. Washington asserts that the hypothetical to the VE was in error because it did not

6   sufficiently include her physical limitation noted by Dr. Lewis that Ms. Washington had decreased

7   grip strength (AR 25, 508.) Nor did it adequately reflect, she argues, Dr. Shertock's finding that

8   Ms. Washington had a "marked impairment with adapting to changes in the routine work-related

9   setting," and that she had a questionable ability to interact with supervisors and co-workers. (AR

10  21-24.) Ms. Washington argues that the ALJ's translation of this limitation into the ability to

11  occasionally interact with coworkers and supervisors does not accurately reflect Dr. Shertock's

12  opinion that Ms. Washington's ability in this regard is questionable.

13       An ALJ "need not include all claimed impairments in his hypotheticals, [but] he must make

14  specific findings explaining his rationale for disbelieving any of the claimant's subjective

15  complaints not included in the hypothetical." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th

16  Cir. 1997). These restrictions on hypothetical questions apply to the hypothetical on which the

17  ALJ bases his findings. *See Lewis*, 236 F.3d at 517-18. The ALJ's failure to properly reflect all of

18  the limitations set forth by the doctors that she credits without explaining her rationale is legal

19  error.

20       Ms. Washington further argues that it was error for the ALJ to rely on the VE's testimony

21  concerning the erosion of positions. (MSJ, ECF No. 16 at 21.) In order for an ALJ to accept VE

22  testimony that contradicts the Dictionary of Occupational Titles, the record must contain

23  "persuasive evidence to support the deviation" such as testimony matching the specific

24  requirements of a designated occupation with the specific abilities and limitations of the claimant.

25  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995). While the VE could not cite to any studies

26  to support his erosion numbers, his testimony was based on his over four decades of professional

27  experience, including "working with employers in modification of jobs." (AR 64.)

28       An ALJ's finding of limitations in an RFC are to be upheld if they are supported by

United States District Court
Northern District of California

1    "substantial evidence." 42 U.S.C. § 405(g); *Vasquez*, 572 F.3d at 591 (quotation omitted).

2    "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such

3    relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

4    *Andrew,* 53 F.3d at 1039.

5        The ALJ must consider the record as a whole. SSR 96-5p. Taking the record as a whole, the

6    ALJ acted appropriately in limiting Ms. Kennedy to "no frequent public or fellow employee

7    contact."

8                                              **CONCLUSION**

9        For the foregoing reasons, the court grants in part Ms. Washington's summary-judgment

10   motion, denies the Commissioner's motion, and remands the case for further proceedings

11   consistent with this order.

12       This disposes of ECF Nos. 16 and 17.

13       **IT IS SO ORDERED.**

14   Dated: November 30, 2015                    _____

15                                              LAUREL BEELER
                                                United States Magistrate Judge
16

17

18

19

20

21

22

23

24

25

26

27

28